```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                       :
HOUSSAM EDDINE HAMRIT,                                 :
                                                       :
                        Plaintiff,                     :
                                                       :     22 Civ. 10443 (JPC)
              -v-                                      :
                                                       :     OPINION AND ORDER
CITIGROUP GLOBAL MARKETS, INC., et al.,                :
                                                       :
                        Defendants.                    :
                                                       :
-----------------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Houssam Eddine Hamrit, proceeding *pro se*, brings this action against Citigroup Global Markets, Inc., Citi Personal Wealth Management, and Citigroup, Inc. (collectively, "Citigroup") alleging that over $400,000 in shares of stock was purchased in his Citigroup brokerage account that he did not authorize and seeking reimbursement for the purchase price. Citigroup now moves to compel arbitration, arguing that Hamrit's brokerage account is governed by a Client Agreement that Hamrit executed, and that the Client Agreement contains a mandatory arbitration provision. In sworn declarations opposing Citigroup's motion, Hamrit unequivocally insists that he never signed that agreement and offers some corroboration for that assertion. Citigroup takes the contrary position that it would not have been possible for Hamrit's brokerage account to have been opened without him first consenting to the Client Agreement, including its arbitration clause. Citigroup, however, primarily presents evidence of the process by which a client can open their own brokerage account, along with conclusory and unsubstantiated assertions that it would not have been possible for a Citigroup employee to have done so. This falls short of coming forward with evidence to cast doubt into the plausibility of the statements in Hamrit's sworn declarations. As a result, issues of material fact prevent the Court from resolving Citigroup's motion to compel

on the papers. The Court thus holds Citigroup's motion to compel in abeyance pending a bench trial on the issue of whether Hamrit entered into the arbitration agreement.

## I. Background

### A. Relevant Facts[1]

#### 1. Hamrit's Alleged Unauthorized Purchases of AERC Shares

Hamrit, a citizen of Algeria who lives in Washington, D.C., has been a Citibank customer with a personal checking and savings account since July 2019. Complaint at 2-3, 11; Dkt. 34 ("Hamrit Decl.") ¶ 2. In early May 2020, Hamrit's relationship manager at Citibank, Jim Riutta, encouraged Hamrit to join the Citi Personal Wealth Management ("CPWM") program. Hamrit Decl. ¶¶ 2-3. Although Hamrit contends that he only agreed to consider joining the CPWM program, he received an email on May 8, 2020 from Sean Randall, a Vice President of Wealth Management and a financial advisor, welcoming him to the program. *Id.* ¶¶ 3-4, Exh. 1. That email provided Hamrit with log-in access to the online trading platform, as well as instructions for how to deposit funds into the brokerage account. *Id.* ¶ 4. Hamrit denies ever completing any application forms or signing any agreements with respect to the CPWM program. *Id.* ¶ 5; Complaint at 11.

Hamrit contends that he eventually accessed the Citibank online application (the "Citibank App") and learned, to his surprise, that he now had a brokerage account. Complaint at 11. According to Citigroup, that account was known as a C29 Brokerage Account. *See* Dkt. 39

---

[1] The facts recited herein are taken from the allegations in the Complaint, Dkt. 1 ("Complaint"), the documents it incorporates by reference, and the declarations, including attached exhibits submitted by the parties. "Courts deciding motions to compel [arbitration] apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). "On a motion for summary judgment, the court considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.*; *accord Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

("Higman Decl.") ¶ 3. A C29 Brokerage Account "was an online brokerage account product Citigroup created to allow customers to engage in self-directed trading on a mobile platform with access to, and the assistance of, a licensed remote trading desk to provide the customer with support." *Id.* ¶ 4.[2] Hamrit alleges that the three Defendants named in this case operated that brokerage account. Complaint at 11.

Hamrit contends that, on November 30, 2021, he was on the Citibank App trying to familiarize himself with the brokerage account function and reviewing trading activity of a company called AreroClean Technologies Inc. ("AERC"), which had conducted an initial public offering about six days earlier. *Id.* At this time, Hamrit did not have funds in his brokerage account, with his funds instead sitting in his personal checking and savings accounts. *Id.* He alleges that, while monitoring the trading activity for AERC stock, "a malfunction occurred on the brokerage account function of the Citibank App resulting in a 'buy' order of 7650 shares of AERC being wrongly executed at the purchase price of USD51.39 per share for a total purchase price of USD393133.50 excluding estimated commissions of USD2.95." *Id.* Hamrit maintains that he never confirmed this transaction, yet "[t]he Citibank App automatically swept the funds for this transaction from [his] personal accounts" without his authorization or approval. *Id.*

According to Hamrit, after receiving a purchase confirmation notice, he tried, unsuccessfully, to reach his financial advisor[3] and contacted someone at customer service for the CPWM program. *Id.* On December 2, 2021, at 9:56 a.m. EST, Hamrit's financial advisor emailed Hamrit stating that there was an issue with his account that needed to be resolved and they spoke over the telephone about seven minutes later. *Id.* During their call, Hamrit explained that he did

---

[2] "Citigroup discontinued opening new C29 Brokerage Accounts in July 2021." Higman Decl. ¶ 3.

[3] The Complaint does not indicate whether this financial advisor was Randall or someone else.

not intend to purchase the AERC stock, but rather was only testing the application. *Id.* Later that morning, Hamrit asked his financial advisor to open an investigation about the mistaken trade transaction and malfunction of the Citibank App. *Id.*

Hamrit alleges that, later in the day on December 2, 2021, he received a trade confirmation, which confirmed "that the transaction was booked to the brokerage account and settled" that day. *Id.* Hamrit contends that he "was shocked to learn that the transaction had been completed" after having reported the issue of the Citibank App malfunction to his financial advisor. *Id.* He was also "equally shocked" to learn that the transaction occurred at a share price of $56.50, for a total purchase price of $432,225.00, which exceeded the amount of funds in his personal accounts with Citibank. *Id.* He alleges that, as a result, Citigroup demanded that he pay the balance of $32,225.00, threatening to liquidate the AERC shares if he failed to do so. *Id.*

### 2. The Account Application and Client Agreement

Citigroup contends that Hamrit opened his brokerage account on or about May 3, 2020, at which point he completed and electronically signed an online Account Application and Client Agreement. Dkt. 21 ("Consalo Decl.") ¶¶ 4-5, Exh. A ("Client Agreement"); Dkt. 23 ("Motion") at 3. The Client Agreement itself has a page with Hamrit's name in capitalized type in a field next to "Account Owner Signature" and the date of "05/03/2020." Client Agreement at 7. Citigroup also has submitted what it contends is a "record confirming Plaintiff's electronic signature." Consalo Decl. ¶ 6, Exh. B ("Electronic Signature Record"). The Electronic Signature Record purportedly reflects Hamrit's electronic signature conveying his agreement to be bound by the terms of the Client Agreement. Electronic Signature Record at 3 ("I have read and understand the CPWM Client Agreement, accept and agree to its terms, and provide my electronic signature.").

Of particular relevance to this case is the Client Agreement's arbitration clause, which provides, in relevant part:

4

**6. Arbitration**

**This agreement contains a pre-dispute arbitration clause.  By signing an arbitration agreement the parties agree as follows:**

- **All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**

\* \* \*

**I agree that all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between me and CGMI[4] . . . concerning or arising from (i) any account maintained by me with CGMI . . . individually or jointly with others in any capacity; (ii) any transaction involving CGMI . . . and me, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us . . . , any duty arising from the business of CGMI . . . or otherwise, shall be determined by arbitration before, and only before the Financial Industry Regulatory Authority ("FINRA").**

\* \* \*

Client Agreement at 9-10 § 6 (emphasis in original).  Similarly, according to Matthew K. Higman, the Digital Wealth Segments Lead of Citigroup US, "[a] customer was required to agree to the terms and conditions for the C29 Brokerage Account by clicking a box 'I agree to the following.'" Higman Decl. ¶ 15; *see also* Dkt. 40-9 at 7 (PowerPoint presentation submitted by Citigroup showing the onboarding process flow for a customer opening a C29 Brokerage Account including the box indicating agreement with the terms and conditions).  From the Electronic Signature Record, it appears that one of those acknowledgements specifically read:

> I acknowledge that I have received a copy of the Client Agreement which contains a pre-dispute arbitration clause at Section 6 . . . .  This Agreement contains other important terms regarding my CPWM investment account with Citigroup Global Markets Inc. (CGMI) . . . and is a legally binding agreement, the equivalent of a signed written contract. . . .

Electronic Signature Record at 3.

---

[4] The Client Agreement defines "CGMI" as "Citigroup Global Markets Inc. or its direct or indirect subsidiaries and affiliates or their successors or assigns."  Client Agreement at 8.

5

### B. Procedural Background

Hamrit initiated this action on December 9, 2022. Dkt. 1. Citing both federal question and diversity jurisdiction, his Complaint alleges the following violations of law: "31 CFR PT.1020, 16 CFR ch. 1, sub F, et seq."; "12 CFR 1002, et seq., 12 USC 1-5710"; and "FRAUD, THEFT OF ASSETS." Complaint at 2. Hamrit seeks the return of his funds in the amount of $432,225, as well as $10 million in punitive damages and interest, along with his costs and expenses in the litigation. *Id.* at 6, 11.

On May 1, 2023, Citigroup moved to compel arbitration and to dismiss or stay this action pending arbitration, citing the arbitration provision in the Client Agreement. Dkts. 20-23. On July 1, 2023, Hamrit filed his opposition papers, which consists of a brief and declarations from Hamrit and a purported forensic scientist named Larry Stewart. Dkts. 33 ("Stewart Decl."), 34, 35 ("Opposition"). As relevant to this Opinion and Order, Hamrit unequivocally insists in his opposition that he never signed the Client Agreement. *See* Hamrit Decl. ¶¶ 5, 7, 17, 18; Opposition at x-xi. On September 1, 2023, Citigroup filed its reply, which includes a declaration from Higman. Dkts. 39, 40, 41 ("Reply"). Hamrit then filed, with leave of Court, Dkt. 44, sur-reply papers on September 22, 2023, which consists of another brief and additional declarations from Hamrit and Stewart. Dkts. 45 ("Hamrit Sur-Reply Decl."), 46 ("Stewart Sur-Reply Decl."), 47.

## II. Legal Standards

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotation marks and brackets omitted); *accord State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d

Cir. 1996). But this "policy in favor of arbitration is limited by the principle that arbitration is a matter of consent, not coercion. Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (internal quotation marks omitted) (alteration in original); *see Doctor's Assocs.*, 934 F.3d at 250 (explaining that the FAA "intended to place arbitration agreements upon the same footing as other contracts," and arbitration remains "a creature of contract" (internal quotation marks and brackets omitted)). A "basic tenet of contract law," including in New York,[5] is that for a contract to be binding, there must be "a 'meeting of the minds' and a 'manifestation of mutual asset.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). "The manifestation of mutual asset must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289 (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)); *accord Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053.

Pursuant to FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court

---

[5] A court "resolve[s] such agreement-formation questions as [it] would most any contract dispute: by applying the law of the state at issue." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (citation omitted). The parties appear in agreement that New York substantive law on the formation of a contract applies. *See* Motion at 8 (asserting that "[t]he Client Agreement is governed by New York law"); Opposition at xiv (setting forth New York law on principles of contract formation). In addition, Section 8 of the Client Agreement provides that, except for statute of limitations issues, "this Agreement and all the terms herein shall be governed and construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws." Client Agreement at 10 § 8. In light of that apparent consent, and the choice-of-law provision of the Client Agreement, the Court applies New York substantive law to the question of whether the parties formed a contract. *See Texaco A/S v. Com. Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997))).

which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.  Yet, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.*  Further, unless a "jury trial [is] demanded by the party alleged to be in default, . . . the court shall hear and determine such issue." *Id.*

In addition, as mentioned, Hamrit is proceeding *pro se* in this litigation.[6]  The Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted); *accord Rahmankulov v. United States*, Nos. 23 Civ. 3206 (RA), 20 Cr. 653 (RA), 2023 WL 3303949, at *1 (S.D.N.Y. May 8, 2023).

### III. Discussion

The threshold question in resolving Citigroup's motion is whether Hamrit signed the Client Agreement and thus entered into a valid arbitration agreement.  That is a question for this Court to decide.  While parties may "agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs.*,

---

[6] On February 20, 2024, after reviewing Hamrit's submissions, the Court directed Hamrit to advise "whether he is an attorney and whether he received any legal assistance in drafting his opposition papers or . . . his Complaint," as that might impact the Court's construction of his filings. Dkt. 54. On February 22, 2024, Hamrit submitted a letter advising that he is not an attorney and that he did not receive legal assistance in drafting his papers, although he "utilized various search engines and sophisticated [artificial intelligence] software to conduct research and for document preparation, editing and translation" and he "drew upon [his] past litigation experience in the United States in which [he] was represented by lawyers." Dkt. 55 at 1.

934 F.3d at 251 (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-301 (2010)). Or said a bit differently, parties can agree to arbitrate questions about a contract's enforceability and scope but cannot agree to arbitrate "questions concerning contract formation." *Id.* (emphasis omitted) (citing *Granite Rock Co.*, 561 U.S. at 299). Thus, "[t]o satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co.*, 561 U.S. at 297. And as suggested above, while courts must favor arbitration when parties bind themselves in an arbitration agreement, "no such special solicitude" is afforded to "the antecedent question of whether the parties actually agreed to arbitrate (that is, whether an arbitration agreement between them exists at all)." *Barrows*, 36 F.4th at 50 (citation omitted); *see Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) ("[T]hough the presumption in favor of arbitration is strong, the law still requires that parties actually agree to arbitration before it will order them to arbitrate a dispute.").

Citigroup, as the party seeking to compel arbitration, bears the initial burden of demonstrating a written agreement obligating the parties to arbitrate. *See Barrows*, 36 F.4th at 50; *Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945); *Blatt v. Shearson Lehman/American Express Inc.*, No. 84 Civ. 7715 (CSH), 1985 WL 2029, at *2 (S.D.N.Y. July 16, 1985). By providing the Client Agreement, which appears to contain a valid arbitration agreement and purportedly was signed by Hamrit, Citigroup has made this initial showing of the apparent existence of an agreement to arbitrate. *See Barrows*, 36 F.4th at 50 ("[The defendant] produced an arbitration agreement that appears to bear [the plaintiff]'s electronic signature, and thereby cleared this bar."); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 241 (S.D.N.Y. 2020). The burden then falls on Hamrit to "demonstrat[e] a 'substantial issue' on the existence *vel non* of an agreement to arbitrate." *Blatt*, 1985 WL 2029, at *2 (quoting *Almacenes*

9

*Fernandez*, 148 F.2d at 628). This requires Hamrit to come forward "with at least *some evidence* to substantiate [his] denial that an agreement had been made." *Barrows*, 36 F.4th at 50 (cleaned up) (emphasis added); *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) ("If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." (citations omitted)).

Hamrit has done so. In moving to compel, Citigroup contends that "it is indisputable that [Hamrit] signed a valid and enforceable arbitration agreement encompassing his claims." Motion at 7. But that is very much in dispute. To be sure, the central question here is not, as Citigroup initially presented it, whether an electronically signed arbitration agreement is enforceable, *see id.*; the question is whether Hamrit in fact electronically signed the Client Agreement. In declarations, signed under penalty of perjury, Hamrit unequivocally attests that he did not:

> I emphasize that I **never** completed any form or application to participate in this CPWM program and never knew that an application to join the program was even necessary. I further emphasize that I **never** provided any of my personal details or other information to either Mr. Riutta or Mr. Randall with respect to the CPWM program. I am fully certain and unequivocal about **never having signed** the Account Application and Client Agreement.

Hamrit Decl. ¶ 5 (emphases in original); *accord id.* ¶¶ 7 ("I categorically and unequivocally state that I never completed the Account Application and Client Agreement, nor did I sign it, electronically or otherwise."), 17 ("I never signed any agreement to arbitrate my claims against the Citigroup Defendants."), 18 (similar); Hamrit Sur-Reply Decl. ¶ 3 ("I firmly maintain my position that I never signed an agreement to arbitrate, and I never agreed to arbitration."). Hamrit further speculates that he "can only assume that someone from Citibank included certain personal

information [in the Client Agreement] from [his] then existing accounts with the Vermont Avenue branch."[7]  Hamrit Decl. ¶ 6.

In an effort to corroborate his insistence that he did not complete or electronically sign the Client Agreement, Hamrit points to various apparent errors contained in the Client Agreement, to include:

- The Client Agreement incorrectly indicates that Hamrit is a U.S. permanent resident alien.  Hamrit Decl. ¶ 8(a).  According to Hamrit, he is an Algerian national who holds a business visitor visa.  *Id.*

- Hamrit's mother's maiden name is misspelled in the Client Agreement.  *Id.* ¶ 8(b).

- The Client Agreement lists for Hamrit a residential address where he no longer lived at the time the Client Agreement was supposedly executed and that in fact was located in a different state than his actual residence at the time.  *Id.* ¶ 8(c) ("On 3 May 2020, I resided in Rockville, Maryland having moved there from Virginia on March 27, 2020.").

- The Client Agreement inaccurately lists Hamrit's total annual income.  *Id.* ¶ 8(e).

- The Client Agreement incorrectly identifies Hamrit's company as being publicly traded.  *Id.* ¶ 8(f).

*See* Opposition at ix.[8]

---

[7] According to Hamrit, he became a client of Citibank at its branch on Vermont Avenue in Washington, D.C.  Hamrit Decl. ¶ 2.

[8] As noted, Hamrit also provided declarations from a purported forensic science expert, Stewart, in opposing the motion to compel.  In addition to reiterating some of these supposed inconsistencies in responses attributed to Hamrit in the Client Agreement, Stewart questions the reliability of Citigroup's position that Hamrit electronically signed the Client Agreement, observing that the internet service provider for Hamrit's cellular phone does not correspond to that reflected on the Electronic Signature Record, citing supposed irregularities and defects in the Client Agreement, and maintaining that the method used by CitiMobile could not accurately verify a client's identity.  *See* Stewart Decl., ¶ 9(ii), (iv), (vii); *see also* Stewart Sur-Reply Decl. ¶¶ 13,

11

Citigroup has responded by attacking the credibility of Hamrit's sworn statements denying having executed the Client Agreement and identifying supposed inconsistencies in that document. Reply at 3-6. According to Higman, the Digital Wealth Segments Lead of Citigroup US, a Citigroup customer could only open a C29 Brokerage Account using the Citibank App on a mobile device, Higman Decl. ¶ 6, and Citigroup employees "did not and could not open a C29 Brokerage Account for a customer," *id.* ¶ 7. For that reason, Higman maintains that "a Citigroup employee could not possibly open a C29 brokerage account on a customer's behalf, nor complete the information in the Account Application and Client Agreement for the customer." *Id.* ¶ 8.

In some instances, a party's sworn declaration denying an agreement to arbitrate, by itself, can be sufficient to create an issue of material fact as to whether an agreement was reached. "Indeed, to hold that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off a motion to compel arbitration would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Barrows*, 36 F.4th at 51 (cleaned up); *see, e.g.*, *Blatt*, 1985 WL 2029, at *2 ("[The plaintiff]'s unequivocal disavowal is sufficient to create a 'substantial issue' as to the existence of a written arbitration agreement binding upon her."). But that does not mean that a declaration will always defeat a motion to compel:

> Where a party merely states that she cannot recall signing an agreement (as opposed to denying she has done so), such a declaration ordinarily fails to create a triable issue of fact. Likewise, where the facts alleged in a nonmovant's declaration are so contradictory that doubt is cast upon their plausibility, then absent other evidence, granting the motion to compel may be appropriate. Further, a party normally does not show the existence of a genuine issue of fact merely by making assertions that are based on speculation or are conclusory. And of course, a party's declaration will not create a material issue of fact in those rare cases where it is blatantly contradicted by the record, so that no reasonable jury could believe it (as

---

17-29. Defendants attack Stewart's qualifications and ask the Court to disregard his report. Reply at 6-9. For purposes of the Court's conclusion that material factual disputes exist that warrant a trial, the Court does not rely on information from Stewart in his declarations. Accordingly, Higman's responses to Stewart's conclusions, *see* Higman Decl. ¶¶ 19-22, are immaterial to this Opinion and Order. At trial, Citigroup will have the opportunity to challenge Stewart's ability to provide expert testimony, should Hamrit wish to call Stewart as a witness.

when a plaintiff's declaration statements are directly refuted by undisputed video evidence).

*Barrows*, 36 F.4th at 51 (cleaned up); *see also Almacenes Fernandez*, 148 F.2d at 628 ("To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial." (citation omitted)).

Here, Hamrit has not averred that he "cannot recall signing an agreement." Rather, he unequivocally and repeatedly has stated that he did not sign any agreement to participate in the CPWM program and never executed an arbitration agreement. *See* Hamrit Decl. ¶¶ 5, 7, 17, 18; Hamrit Sur-Reply Decl. ¶ 3.[9] Nor were "the facts alleged in [Hamrit]'s declaration[s] . . . so contradictory that doubt is cast upon their plausibility," or "blatantly contradicted by the record, so that no reasonable [factfinder] could believe [them]." *Barrows*, 36 F.4th at 51 (cleaned up).

First, Citigroup simply has failed to present non-conclusory evidence as to why Hamrit's denial is implausible. While Citigroup provides evidence of the onboarding process by which *a customer* could open a C29 Brokerage Account through their Citibank App, *see* Dkt. 40-9 at 7

---

[9] For this reason, this case is readily distinguishable from *Flores v. Chime Financial, Inc.*, No. 21 Civ. 4735 (RA), 2022 WL 873252 (S.D.N.Y. Mar. 23, 2022), on which Citigroup relies. *See* Reply at 2. In opposing a motion to compel arbitration, the plaintiff in *Flores* contended that she did not recall which screens were displayed when she signed up for her account, which the court concluded did not create an issue of fact as to whether she assented to the contract's terms particularly in light of evidence of what a user must do to set up an account. *Flores*, 2022 WL 873252, at*5. In contrast, Hamrit has unequivocally sworn that he did not sign the Client Agreement and presented reasons to question the accuracy of the information contained therein. Several other cases cited by Citigroup, *see* Reply at 2-3, are distinguishable for similar reasons. *See Cimillo v. Experian Info. Sols., Inc.*, No. 21 Civ. 9132 (VB), 2023 WL 2473403, at *6 (S.D.N.Y. Mar. 13, 2023) (compelling arbitration where the plaintiff did not recall having signed up for an online credit monitoring service or entering into an arbitration agreement in connection with that service, in the face of evidence from the defendant that she agreed to an arbitration agreement when she registered for the service); *Moton v. Maplebear Inc.*, No. 15 Civ. 8879 (CM), 2016 WL 616343, at *6 (S.D.N.Y. Feb. 9, 2016) (compelling arbitration where the plaintiff "d[id] not deny that he received and signed" the agreement, while the defendant presented "hard evidence that [the plaintiff] received the agreement").

(PowerPoint presentation), Citigroup fails to explain why *a Citigroup employee* would have been unable to have opened such an account for a customer. Higman's declaration falls well short of establishing the absence of a material fact on that point. Higman merely relies on entirely conclusory assertions in expressing his view that it would have been impossible for a Citigroup employee to open a C29 Brokerage Account for Hamrit, devoid of any explanation for why that is the case:

> 7. Citigroup employees did not and could not open a C29 Brokerage Account for a customer. Only a customer logging in through the Citi Mobile app using his or her existing credentials could open such an account.
>
> 8. Accordingly, a Citigroup employee could not possibly open a C29 brokerage account on a customer's behalf, nor complete the information in the Account Application and Client Agreement for the customer. Only a customer seeking to open a C29 Brokerage Account could input information on his mobile device.
>
> 9. Thus, contrary to Plaintiff's speculation, his relationship manager could not, and did not establish a C29 Brokerage account on Plaintiff's behalf. Only Plaintiff could create a C29 Brokerage Account.

Higman Decl. ¶¶ 7-9. Further, Higman's contention that "a C29 Brokerage Account was only available to pre-existing retail customers with pre-existing online log-in credentials," *id.* ¶ 10, does not necessarily mean that a Citigroup employee would not be able to open such an account for a pre-existing customer like Hamrit. Similarly, as noted, Citigroup's PowerPoint presentation demonstrates the onboarding process for a customer opening a C29 Brokerage Account, but that document does not indicate the impossibility of a Citigroup employee opening such an account. *See generally* Dkt. 40-9.

Nor does Citigroup's reliance on the Electronic Signature Record resolve any disputed issues of material fact with respect to whether Hamrit entered into an arbitration agreement. Here too, Citigroup relies on entirely conclusory and unsubstantiated assertions that the Electronic Signature Record supports its position that Hamrit signed the Client Agreement. *See, e.g.*, Reply

14

at 2 ("The [Electronic Signature Record] conclusively establishes that Plaintiff opened the C29 Brokerage Account." (citing Higman Decl. ¶ 19)). Yet neither Citigroup's briefing nor Higman's declaration explains why that is the case. Paragraph 19 of Higman's declaration reads:

> 19.     The Electronic Signature Record ("ESR") conclusively establishes that Plaintiff opened the C29 Brokerage Account which is the subject of this action. I understand Plaintiff's proffered expert claims that the IP address set forth on the ESR is a Verizon Business IP address, while Plaintiff's mobile phone service was with T-Mobile. However, this reflects a fundamental misunderstanding concerning the nature of an IP address.

Higman Decl. ¶ 19 (emphasis in original); *see id.* ¶ 20 (explaining that an IP address is not unique to the device the customer would use to open the account, but rather to the wireless network to which that device connected). This conclusory assertion does not answer the question of why it was impossible for someone other than Hamrit to have completed online account-opening steps that supposedly are reflected in the Electronic Signature Record.

Second, Higman's conclusory assertions that Hamrit created the C29 Brokerage Account stand in stark tension with Hamrit's unequivocal sworn assertions that he did not sign the Client Agreement, assertions that find some degree of corroboration from various apparent inaccuracies in the form. And at this stage, the Court must resolve all ambiguities and draw all reasonable inferences in Hamrit's favor. *See Barrows*, 36 F.4th at 49 ("Because motions to compel arbitration are governed by a standard 'similar to that applicable for a motion for summary judgment,' a court must 'draw all reasonable inferences in favor of the non-moving party.'" (quoting *Nicosia*, 834 F.3d at 229)); *cf. Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (explaining that in considering a motion for summary judgment, a court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment" (quotation omitted)). Hamrit has come forward with evidence that creates a dispute of material fact as to whether he executed the Client Agreement, which cannot be properly resolved without a trial. *See Barrows*, 36 F.4th at 50-52 (vacating the district court's order granting the

defendant's motion to dismiss and compel arbitration because the court "completely discounted the evidentiary value of [the plaintiff's] sworn declaration," which contained "specific and exacting terms" and was submitted "under penalty of perjury"); *see also Vaccaro v. Ins. Co. of N. Am.*, No. 96 Civ. 1161 (AHN), 1996 WL 762234, at *3 (D. Conn. Dec. 23, 1996) (observing that "district courts should not decide disputed factual issues on affidavits" (citing *Tehran-Berkeley Civil & Env't Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 816 F.2d 864, 869 (2d Cir. 1987))).[10] As provided in the FAA, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *accord Barrows*, 36 F.4th at 49; *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.").

Accordingly, the Court will conduct a trial on the issue of whether the parties entered into an agreement to arbitrate. Because Hamrit has not made a demand for that trial to occur by jury, the Court will conduct a bench trial. *See* 9 U.S.C. § 4 ("If no jury trial be demanded by the party alleged to be in default, . . . the court shall hear and determine such issue."); *NATS, Inc. v. Radiation Shield Techs., Inc.*, No. 21 Civ. 430 (AWT), 2022 WL 1619687, at *1 (D. Conn. Feb. 18, 2022) ("[T]he plain language of Section Four provides that the jury trial must be demanded by the party alleged to be in default." (citation omitted)); *see also NATS*, 2022 WL 1619687, at *2 (explaining

---

[10] To be sure, Citigroup has offered explanations for how much of the incorrect information identified by Hamrit could have appeared in the Client Agreement. For instance, Higman notes that Hamrit's former address could have been automatically populated in document. *See* Higman Decl. ¶ 13 ("Although [Hamrit] had the option to change the address during the process, he did not."). Citigroup likewise speculates that Hamrit must have misspelled his mother's maiden name given the close proximity of the letters "G" and "H" on a keyboard. *See id.* ¶ 14 ("It appears [Hamrit] mistyped his mother's maiden name replacing an 'H' with a 'G,' which letters are next to one another on the keyboard."). Citigroup also appears to dispute Hamrit's citizenship, *see* Reply at 4-5, and to contend that Hamrit continued to have a Virginia address at the time he executed the Client Agreement, *see* Dkts. 40-5, 40-6. These arguments, many of which rely on speculation, do not eliminate the existence of a genuine dispute of material fact, particularly where all reasonable inferences must be drawn in Hamrit's favor.

that a "general demand in the complaint [for a jury trial does] not constitute a demand for a jury trial on the issue related to the making of an arbitration agreement, as required by Section Four of the Federal Arbitration Act" (citing *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1138, 1349-50 (11th Cir. 2017))).

### IV. Conclusion

To be sure, this Opinion and Order should not be read as concluding—or even suggesting—that Harmit's contentions in his declarations are accurate, or that he did not in fact enter into an arbitration agreement with Citigroup.  Rather, Hamrit has come forward with "some evidence" to warrant a trial on that issue and Citigroup has not cast doubt into the plausibility of Hamrit's evidence.  Credibility assessments and material factual disputes thus remain, and those must be resolved at trial.  The Court therefore holds Citigroup's motion to compel arbitration in abeyance for the time being and will conduct a bench trial on the issue of whether Hamrit entered into an arbitration agreement.  *See NATS, Inc. v. Radiation Shield Techs., Inc.*, No. 22-369, 2023 WL 2416160, at *2 (2d Cir. Mar. 9, 2023).

The parties are ordered to appear before the undersigned for a status conference via teleconference on April 3, 2024, at 10:00 a.m., for the Court to set a date, in the near future, for trial on whether the parties agreed to arbitrate.  At the conference, the parties also should be prepared to discuss whether any limited, expedited pretrial discovery would be useful.  Unless the Court orders otherwise, at the scheduled time, counsel for all parties should call (866) 434-5269, access code 9176261.

The Clerk of Court is respectfully directed to close the motion pending at Docket Number 20.

SO ORDERED.

Dated: March 26, 2024
New York, New York

_____
JOHN P. CRONAN
United States District Judge