UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
HOUSSAM EDDINE HAMRIT,                              :
                                                    :
                        Plaintiff,                  :
                                                    :    22 Civ. 10443 (JPC)
            -v-                                     :
                                                    :    OPINION AND
CITIGROUP GLOBAL MARKETS, INC., *et al.*,           :    ORDER
                                                    :
                        Defendants.                 :
                                                    :
-----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Defendants Citigroup Global Markets, Inc., Citi Personal Wealth Management, and Citigroup, Inc. (collectively, "Citigroup") move *in limine* to exclude the proffered expert testimony of Larry F. Stewart. *Pro se* Plaintiff Houssam Eddine Hamrit seeks to have the Court consider at trial expert conclusions from Stewart on the issue of whether he entered into an arbitration agreement with Citigroup when his online brokerage account was opened. For the following reasons, the Court grants Citigroup's motion.

### I. Background

In its March 26, 2024 Opinion on Citigroup's pending motion to compel arbitration, the Court outlined the background of this dispute. *See Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 10443 (JPC), 2024 WL 1312254 (S.D.N.Y. Mar. 26, 2024). The Court assumes the parties' familiarity with that background. In that Opinion, the Court concluded that Hamrit had come forward with some evidence to raise a dispute of material fact on whether the parties agreed to arbitrate and that Citigroup failed to cast doubt on the plausibility of that evidence, and therefore ordered a trial on that limited issue. *Id.* at *9. In reaching that result, the Court noted that Citigroup

had "attack[ed] Stewart's qualifications and ask[ed] the Court to disregard his report," which was part of Hamrit's opposition to Citigroup's motion to compel. *Id.* at *6 n.8. The Court did not rely on Stewart's conclusions in the Opinion, but noted that Citigroup would have "the opportunity to challenge Stewart's ability to provide expert testimony [at trial], should Hamrit wish to call Stewart as a witness." *Id.* Following the March 26, 2024 Opinion, the parties conducted limited discovery in preparation for a bench trial on whether Hamrit entered into an arbitration agreement with Citigroup.

On August 29, 2024, Citigroup moved *in limine* to exclude Stewart's anticipated testimony under Federal Rule of Evidence 702. Dkt. 85 ("Motion"). Hamrit filed his opposition on September 12, 2024. Dkt. 90 ("Opposition").[1] Citigroup filed a reply declaration on September 19, 2024. Dkt. 91 ("Reply"). "Because [the defendants'] *Daubert* challenge[ was] raised just prior to trial and this trial was conducted as a bench trial, the court elected to hear the *Daubert* proof during the trial itself." *Howard Univ. v. Borders*, No. 20 Civ. 4716 (LJL), 2022 WL 11817721, at *10 (S.D.N.Y. Oct. 20, 2022) (internal quotation marks omitted). "Although a court has general discretion to hear expert testimony and reserve [ruling] on a *Daubert* motion until the conclusion of a bench trial, it still must perform a Rule 702 and *Daubert* analysis before it relies upon expert testimony." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18 Civ. 5075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022). Trial in this matter commenced on October

---

[1] The Court construes Hamrit's *pro se* opposition to Citigroup's motion liberally and interprets his filings and arguments in court to raise the "strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks omitted) (collecting cases); *accord Rahmankulov v. United States*, Nos. 23 Civ. 3206 (RA), 20 Cr. 653 (RA), 2023 WL 3303949, at *1 (S.D.N.Y. May 8, 2023) (explaining that while the Court must construe *pro se* pleadings liberally, "a *pro se* litigant is not exempt 'from compliance with relevant rules of procedural and substantive law'" (quoting *Triestman*, 470 F.3d at 477)).

22, 2024, and the Court, reserving a ruling on the pending motion *in limine*, heard Stewart's testimony on October 25, 2024.[2]

Hamrit seeks to offer expert conclusions from Stewart that fall into two buckets. First, Stewart testified that the security standards Citigroup employed did not align with those of the National Institute of Standards and Technology ("NIST") for high value transactions. Trial Tr. at 299:17-300:4, 319:6-11; *see also* Pl. Exh. 9 ("Stewart Report") at 12 (citing NIST's Digital Identity Guidelines). Second, Stewart concluded that Citigroup's system did not truly verify Hamrit's identity given discrepancies in the account opening documentation.[3] Trial Tr. at 318:23-319:5; *accord* Stewart Report at 14 ("[I]t is my expert opinion that in light of the inadequacies and abnormalities in the evidence as enumerated above, the [Account Application and Client Agreement] are not reliable as conclusive proof of Mr. Hamrit's electronic signature.").

## II. Legal Standard

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[2] The transcript of the bench trial is at Docket Numbers 100, 102, and 104. In this Opinion, the trial transcripts are collectively referred to as "Trial Tr." and the parties' trial exhibits are referred to as "Pl. Exhs." and "Defts. Exhs."

In addition to Stewart's testimony, Hamrit sought to introduce into evidence several declarations from Stewart and Stewart's report. *See* Pl. Exhs. 8, 9, 22, 23. The Court accepted these exhibits contingent on whatever weight they should receive following the Court's resolution of Citigroup's motion *in limine*. Trial Tr. at 302:23-25; *see also id.* at 326:14-17.

[3] According to Citigroup, Hamrit completed and executed the Account Application and Client Agreement when he created his online brokerage account on May 3, 2020. The Account Application and Client Agreement was admitted at trial as Defendants' Exhibit 1. At the core of the trial is whether Hamrit agreed to an arbitration clause contained at section 6 of that document.

3

>   (b) the testimony is based on sufficient facts or data;
>
>   (c) the testimony is the product of reliable principles and methods; and
>
>   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The fundamental requirements are thus that such evidence be relevant and reliable." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied," although "the district court is the ultimate gatekeeper." *Id.* (internal quotation marks omitted). This role requires the district court to find that any admitted expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "Relevancy is determined by whether the proffered evidence 'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable.'" *Town & Country Linen Corp.*, 2022 WL 2757643, at *2 (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002)). Reliability, meanwhile, encompasses "a number of factors . . . that district courts may consider," and is designed to be a flexible standard, "focus[ed] on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Amorgianos*, 303 F.3d at 266. "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.*

### III. Discussion

Citigroup argues that Stewart is not qualified to offer an opinion regarding the financial technology matters relevant to whether Hamrit electronically executed the arbitration agreement,

Motion at 4-5, and also contends that Stewart's testimony would not be helpful to the trier of fact as his opinions did not stem from any specialized expertise but instead merely convey lay observations, *id.* at 6-7.

### A. Qualifications

"Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, No. 23 Civ. 4942 (AT) (SDA), --- F. Supp. 3d ---, 2024 WL 3638329, at *5 (S.D.N.Y. Aug. 2, 2024) (internal quotation marks omitted). "As a threshold matter, trial courts must consider whether the witness is qualified by knowledge, skill, experience, training, or education to render his or her opinions as an expert, before reaching an analysis of the testimony itself." *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016).

Citigroup contends that Stewart is not qualified to offer an expert opinion concerning whether Hamrit electronically executed an arbitration agreement because he "has no demonstrated expertise in cybersecurity, financial technology, opening of online accounts, or computer science generally." Motion at 5. Instead, Citigroup maintains that Stewart's "expertise is limited to handwriting, ink, document analysis and crime scene investigations." *Id.* "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

At trial, Stewart explained that he is "a forensic scientist that specializes in chemistry and document security." Trial Tr. at 282:5-7. And Stewart does appear to have expertise in these areas from his experience, training, and education. *See id.* at 282:8-283:6 (Stewart testifying about his education, certification, and membership in professional associations), 283:24-284:19 (Stewart

5

describing his training, publications, and membership on boards in this field). When questioned by Citigroup's counsel on *voir dire*, Stewart further testified that, in his prior role as a laboratory director with the United States Secret Service,[4] he supervised the "digital evidence laboratory" and reviewed analytic work on that subject, although he did not perform the primary analysis. *Id.* at 288:15-25.

While Citigroup correctly notes Stewart's lack of expertise in computer science, financial technology, or cybersecurity, Hamrit offered Stewart at trial as an expert in "document security." *Id.* at 286:17-19; *see also* Opposition at 4-7. When asked what he understood the term "document security" to mean, Stewart testified that "[t]here are a number of levels of security that are attached to documents at the federal level which is where I work. NIST is one of the main ones that designate the security involved in documents. And also a group called FinCEN. Those are in addition to the FinTech he's mentioning, which is mainly for bank fraud situations." Trial Tr. at 291:10-19. Stewart explained that at the Secret Service, he dealt with document security issues and received training in "all aspects of documents from passports to personal documents like driver's licenses and identity documents that can be created either online or manually using devices," as well as in investigating financial institution fraud involving digital systems. *Id.* at 292:4-19. Stewart's most recent formal training in this area, though, was in the 1990s. *Id.* at 292:21-25. Nonetheless, "[e]ven if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 328 (S.D.N.Y. 2022).

---

[4] According to Stewart's resume, he held various positions with the Secret Service from July 1982 through June 2005. Pl. Exh. 8 ("Stewart July 28, 2023 Declaration") at 57.

The parties disagree on whether Stewart's experiences qualify him to offer an expert opinion on the narrow issue of the trial: whether Hamrit electronically executed an arbitration agreement with Citigroup when his online brokerage account was opened. *Compare* Motion at 5, *with* Opposition at 6-7. In the end, the Court need not determine the full reach of Stewart's expertise. As will be explained at *infra* III.B, the opinions Stewart seeks to offer do not survive Rule 702 on relevance or reliability grounds, and thus must be excluded regardless of his expert qualifications. The Court therefore will assume without deciding that Stewart has expertise in the proffered field of "document security" for Rule 702 purposes.

The Court emphasizes one caveat to this assumption, however. A key piece of evidence in this case is a document called a ThreatMetrix report. *See* Defts. Exh. 4. One of Citigroup's witnesses at trial, a Citigroup fraud risk officer named Eustacio Valfre, explained that this report captures "[e]ach digital session" that a client has on Citigroup's online platform and that the report "has a bunch of different data points that [Citigroup's fraud officers] review" when assessing fraud risk. Trial Tr. at 94:5-95:3. Valfre testified that these reports include certain "digital evidence," such as the "time that a person may have logged in on their account, [the] account user ID that was used, the time that it was accessed, what was done within that session, and how that session was authenticated." *Id.* at 96:4-7. The ThreatMetrix report captures "session information, such as a unique session ID[,] . . . geo location, which would be IP address, true IP address, and DNS IP address[,] . . . latitude and longitude[,] . . . transaction information, what was done within that session, if there was any type of transfers, and such. And then you have an authentication [the user] used, or any challenges, and how they were passed." *Id.* at 96:8-14. Valfre also testified that Citigroup's fraud risk officers receive six weeks of training on the ThreatMetrix product and other fraud prevention tools, which enables them to "review and analyze data that [Citigroup is] seeing

7

in our digital space," and that the training includes "the usage and the review of the data fields that we receive, and using [Citigroup's] tools, and how to interpret that information." *Id.* at 90:6-23, 93:7-17.

It is unclear whether Stewart sought to offer his opinions based on the ThreatMetrix report, or otherwise to opine on the contents of the report. Indeed, Stewart does not identify the ThreatMetrix report in his own purported expert report among the materials he reviewed in arriving at his conclusions, *see* Stewart Report at 1-2,[5] nor does he reference the ThreatMetrix report in his report's "Observations," *see id.* at 2-14. Yet, at trial, Stewart testified that he reviewed the ThreatMetrix report in preparing his report. Trial Tr. at 296:6-9. To be sure, however, Stewart lacks "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to offer opinions based on the ThreatMetrix report or concerning its contents, as the Court ruled at trial, Trial. Tr. at 306:11-307:6.

"[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely v. City of New York*, 414 F.3d 381, 399 n.13 (2d Cir. 2005). And Stewart plainly is not qualified to offer an expert opinion regarding the ThreatMetrix report. During *voir dire*, Stewart testified that he has never received any training concerning ThreatMetrix, has never offered an opinion concerning ThreatMetrix, and has never drafted a report concerning ThreatMetrix. Trial Tr. at 289:5-13. Nor did Hamrit otherwise offer any information indicating Stewart's training or experience with regard to ThreatMetrix. Given Stewart's testimony, the

---

[5] Hamrit's Opposition also indicates that Stewart had not reviewed the ThreatMetrix report prior to preparing his report for this case. *See* Opposition at 9 (complaining that "Mr. Stewart must be allowed the opportunity to review, analyze and testify about" the ThreatMetrix report); *see also* Reply, Exhs. B, C (establishing that, contrary to Hamrit's gripes, the ThreatMetrix report was disclosed during discovery).

8

limits of his training and experience, and his lack of familiarity with the ThreatMetrix product, the Court reiterates its determination that Stewart is not qualified to offer testimony that would aid the Court's assessment of the ThreatMetrix report. *See id.* at 306:13-307:6 (the Court observing, after hearing Stewart's testimony, that Stewart "very clearly testified that he has no training concerning ThreatMetrix, [has] not offered any opinion in the past" concerning ThreatMetrix, and has "never drafted a report concerning" ThreatMetrix, and thus "[a]nything Mr. Stewart would testify about that report is something that [the Court is] able to derive from the report that's already in evidence").

The Court acknowledges that "[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Am. Empire Surplus Lines Ins. Co*, 2024 WL 3638329, at *5 (internal quotation marks omitted). But to be sure, that is not the case when it comes to the ThreatMetrix report. And the Court's focus remains on "whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Id.* (internal quotation marks omitted). Stewart's purported expertise in "document security" was devoid of any knowledge or training that would allow him to opine on the probative value of the information in a technical product like the ThreatMetrix report that captures a variety of pieces of digital evidence and requires specialized training to properly understand and interpret.

In sum, the Court will assume without deciding that Stewart possesses expert qualification to testify on matters in this case, with the understanding that he may not base any opinions on the ThreatMetrix report or opine on its contents.

### B. Relevance and Reliability

Even assuming *arguendo* Stewart's expertise in document security, his proffered expert testimony fails the relevance and reliability requirements of Rule 702. Starting with relevance, Rule 702(a) requires that the expert's knowledge "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This requirement "goes primarily to relevance." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Daubert*, 590 U.S. at 591). But "expert testimony is not helpful if it simply addresses 'lay matters which the [finder of fact] is capable of understanding and deciding without the expert's help.'" *Id.* (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). And "[a] court should not admit expert testimony that is 'directed solely to lay matters which a [finder of fact] is capable of understanding and deciding without the expert's help.'" *Pacific Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 114 (S.D.N.Y. 2021) (quoting *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001)).

Almost all of Stewart's proffered testimony falls into this category of matters that the Court is fully capable of understanding without assistance from an expert. Stewart explained that his methodology entailed "first examining the submitted Account Application and Client Agreement followed by an analysis of the submitted supportive documentation and self-obtained data. The results were then compared and presented here." Stewart Report at 2; Stewart July 28, 2023 Declaration ¶ 7. In other words, Stewart looked at two documents and observed that some of the information in each was different. From this method, Stewart concluded that Citigroup's system did not "truly verif[y] the identity of Mr. Hamrit," Trial Tr. at 318:23-319:5, and that the Account Application and Client Agreement "are not reliable as conclusive proof of Mr. Hamrit's electronic signature," Stewart Report at 14.

The Court, of course, is well-equipped to do the same analysis. It requires no expertise, for example, to observe that Hamrit's "residential address at the date of the Account Application and Client Agreement was different from the residential address stated therein," that Hamrit's "immigration status is different from that stated in the Account Application and Client Agreement," or that a document has "different fonts," contains a "blurred image," or lacks a signature. Stewart July 28, 2023 Declaration ¶ 9; *see also* Stewart Report at 2-10 (providing these and other examples of discrepancies, such as different spellings of Hamrit's mother's maiden name on the Account Application and Client Agreement and on Hamrit's birth certificate). These are simply lay observations concerning the contents of two documents, which in no way rely on Stewart's purported expertise in document security. *See Pacific Life Ins. Co.*, 571 F. Supp. 3d at 114. Moreover, this methodology directly led Stewart to draw a conclusion that a layperson, lacking expertise in document security, would reach: discrepancies between the documents raise a question of their authenticity. *See Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert testimony on the subject of fire damage on the grounds that "the mere fact that a fire causes increasing damage the longer it burns is an obvious statement, and a lay person is entirely capable of reaching this conclusion without the help of an expert").

Stewart's purported opinion that Citigroup did not verify Hamrit's identity because there were discrepancies in the account opening documentation, therefore, does not rely on any expertise but is drawn from lay matters that the Court is "capable of understanding and deciding without the expert's help.'" *Pacific Life Ins. Co.*, 571 F. Supp. 3d at 114 (quoting *Mulder*, 273 F.3d at 104). Because Stewart's observations and conclusions in this regard do not "help the [Court] to

11

understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), they fail the helpfulness requirement of Rule 702 and are excludable on that basis.

Moreover, Stewart's proffered expert testimony suffers from reliability concerns. Rule 702(b) requires that an expert's testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). The undisputed evidence at trial, however, makes clear that Stewart's testimony and conclusions repeatedly were predicated on insufficient facts and invalid assumptions.

Most significantly, Stewart's proffered conclusion that Citigroup's security standards were insufficient relied on a fundamentally flawed premise as he assumed the absence of biometric authentication. Stewart testified that Hamrit's purported account-opening transaction did not comply with the standards of the NIST for large dollar transactions. Trial Tr. at 299:17-300:4. Stewart reasoned in his report that Citigroup's failure to use such standardized measures, like private encryption keys and electronic signature authentications, undermine confidence that Hamrit in fact entered into the arbitration agreement. Stewart Report at 10-14. But at trial, when asked whether he would have concerns with security if someone accessed their account via "biometrics through using face ID," Stewart replied, "No. As you add additional security through face identification or, you know, a two-step process, like they have in a lot of different situations now, that adds security to it." Trial Tr. at 300:22-301:7. Stewart remarked, however, that he saw "no evidence of that being done here." *Id.* at 301:7. Stewart later acknowledged on cross-examination that using face identification to log in in this manner "would be an added measure of security," which he would consider to be "pretty strong." *Id.* at 313:6-13; *see also id.* at 319:4-5 (Stewart testifying that he "saw no evidence of multifactor authentication . . . based on what was provided to [him]").

Yet, the undisputed evidence at trial established that Hamrit's account had in place biometric identification for access and that such access was indeed used when his online brokerage account was opened. When asked during cross-examination if he had "registered [his] online accounts so [he] could log in using facial ID," Hamrit admitted, "I have face ID. Yes, I have face ID." *Id.* at 242:7-12. Hamrit also testified that he had registered his online accounts to use face identification before May 3, 2020, the date of the transaction opening his brokerage account. *Id.* at 242:14-18. Valfre testified that the ThreatMetrix report logged a biometric login during the digital session in which the brokerage account was opened. *Id.* at 97:21-25 ("I can see that this session on 5/3 began with user ID Houssam10, with that unique ID number under column C. And this was the initial login, and it was a biometric login. It was a face ID so, basically, holding a phone up or camera, and facial recognition to log in, to authenticate."), 98:11-13 ("Q. And he logged in using facial recognition, not using a password; is that correct? A. That's correct."). The ThreatMetrix report itself likewise established that biometric identification was used to initiate that account-opening session. *See* Defts. Exh. 4, Rows 103-104 (indicating a face identification login to begin an online session on May 3, 2020, five minutes before the brokerage account was opened). Indeed, the ThreatMetrix report is replete with face identification logins. *See generally id.* Stewart's conclusion that Citigroup's security standards did not meet those of the NIST thus rested on the faulty assumption that there was no evidence of Hamrit having biometric access to his accounts or that such biometric access was used to initiate the session when Hamrit's brokerage account was opened.

This is not the only instance of Stewart basing his testimony on insufficient or incomplete information to draw conclusions regarding the authenticity of the records at issue. Stewart testified about font issues and the "fuzzy" background on the Client Agreement. Trial Tr. at 318:14-17.

13

Stewart said he was "not sure how that was created, whether it was a cut and paste from another document or electronically generated by Citigroup. But if it was electronically created, [he] would ask for an explanation as to why there is a difference in the quality between that and the rest of the document." *Id.* at 318:17-22. Matthew Higman, a Citigroup employee familiar with the bank's digital wealth products, testified that this effect occurs because when a customer "signs" their name by typing it into the agreement, Citigroup takes an image of what they typed to use as the customer's "signature" and renders that along with the date they typed in as evidence of signature. *Id.* at 33:13-34:21. No evidence at trial contradicted this testimony. While it may be understandable why Stewart lacked familiarity with Citigroup's internal procedures, this too demonstrates that his conclusions relied on insufficient facts and flawed assumptions.

"Where the record indicates that the expert's analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value." *Bank of N.Y. Mellon Tr. Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 649-50 (S.D.N.Y. 2012) (alterations adopted) (collecting cases). Here, Stewart's failure to base his conclusions on complete and accurate information severely diminishes any probative value of his testimony. And in particular, Stewart's flawed assumption that biometric access was not in place when Hamrit's online brokerage account was opened, in the face of overwhelming and undisputed evidence to the contrary, renders his conclusion about whether Citigroup met the NIST's standards devoid of any probative value and require exclusion of that conclusion.

The Court therefore finds that Stewart's conclusions that Citigroup failed to employ security standards that aligned with those of the NIST for high value transactions and that Citigroup's system did not truly verify Hamrit's identity do not survive Rule 702(a) and Rule

702(b). The Court thus excludes Stewart's proffered expert testimony and strikes Hamrit's Exhibits 8, 9, 22, and 23 from the trial record.

## IV. Conclusion

For these reasons, Citigroup's motion is granted. Post-trial briefing remains due by January 31, 2025, with optional response briefs due by February 21, 2025. The Clerk of Court is respectfully directed to close Docket Number 83.

SO ORDERED.

Dated: November 26, 2024
      New York, New York

                                           JOHN P. CRONAN
                                    United States District Judge