UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                   :

HOUSSAM EDDINE HAMRIT,         :

                Plaintiff,      :

                                   :

              -v-             :         22 Civ. 10443 (JPC)

                                   :

CITIGROUP GLOBAL MARKETS, INC., *et al.*,  :     FINDINGS OF FACT AND

                                   :     CONCLUSIONS OF LAW

                Defendants.    :

                                   :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Houssam Eddine Hamrit ("Hamrit"), proceeding *pro se*, brings this action against Citigroup Global Markets, Inc., Citi Personal Wealth Management, and Citigroup, Inc. (collectively, "Citigroup") alleging that over $400,000 in stock was purchased in his Citigroup brokerage account without his authorization and seeking reimbursement for the purchase price. Citigroup then moved to compel arbitration, relying on an arbitration provision in a client agreement that it claims Hamrit executed. Dkt. 20. Citigroup further asked the Court to stay this action pending completion of that arbitration. *Id.*

      On March 26, 2024, the Court issued an Opinion and Order holding Citigroup's motion in abeyance pending the completion of a bench trial pursuant to 9 U.S.C. § 2 on the limited issue of whether the parties had entered into an arbitration agreement. *Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 10443 (JPC), 2024 WL 1312254 (S.D.N.Y. Mar. 26, 2024). The Court conducted that bench trial on October 22, 23, and 25, 2024,[1] and received post-trial submissions from the

---

[1] The transcript of the bench trial is at Docket Numbers 100, 102, and 104, and is cited herein as "Trial Tr."

parties, *see* Dkts. 117 ("Citigroup Br."), 118 ("Hamrit Br."),[2] 119 ("Citigroup Reply"), 120 ("Hamrit Reply").

Based on the evidence presented at trial, the Court finds that Hamrit entered into an arbitration agreement with Citigroup when he completed and submitted an application for a C29 brokerage account on May 3, 2020. The Court further concludes that the arbitration agreement is valid and enforceable against Hamrit, and that the agreement encompasses the claim he brings in this action. The Court therefore grants Citigroup's motion to compel arbitration and stays this action during the pendency of that arbitration or until further order of the Court.

## I. Bench Trial Standards

"In an action tried on the facts without a jury," a district judge "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited." *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012). Accordingly, the Court below sets forth its findings of fact, *see infra* II, followed by its conclusions of law, *see infra* III.

## II. Findings of Fact

The Court heard testimony at trial from six witnesses. Citigroup called: (1) Matthew Higman, Citigroup's current head of Global Digital and former head of Digital Wealth Products for the company's U.S. Consumer Wealth Division, Trial Tr. 9:11-84:7; (2) Eustacio Valfre, a fraud risk officer at Citibank, *id.* at 89:18-128:4; (3) James Riutta, a former Citigold relationship

---

[2] Hamrit's post-trial brief attaches a number of exhibits, many of which were not admitted as evidence at trial. *See* Hamrit Br., Exhs. 1-27; Trial Tr. at 326:9-329:8 (recounting the exhibits that were received in evidence during the trial). The Court does not consider the attachments that are not in evidence. *See Marini v. Adamo*, 995 F. Supp. 2d 155, 176 n.16 (E.D.N.Y. 2014) (rejecting arguments relying on evidence first introduced in a post-trial submission because "[o]bviously, this Court cannot consider evidence not introduced during the trial").

manager at Citigroup's Metro Center and McPherson Square branches in Washington, D.C., *id.* at 129:4-137:25; and (4) Sean Randall, a former wealth advisor at Citigroup's McPherson Square branch, *id.* at 138:18-152:19, 167:6-189:9. Hamrit testified on his own behalf, which entailed him testifying in narrative form on direct examination and then being cross-examined by Citigroup's counsel. *Id.* at 193:21-265:14. Hamrit also called Larry Stewart, the Owner of Global Forensic Services LLC. *Id.* at 281:14-320:25.[3]

The Court begins with its findings concerning the credibility of these trial witnesses. *See Krist*, 688 F.3d at 95. With regard to Citigroup's four witnesses—Higman, Valfre, Riutta, and Randall—the Court finds that each testified credibly. In particular, Higman's testimony about the process by which a client would sign up for a C29 brokerage account was coherent, consistent, and firmly corroborated by evidence presented at trial that illustrated that account-opening process in a step-by-step manner. Valfre's testimony likewise was coherent, consistent, and corroborated by documentary evidence. While understandably Riutta and Randall were not able to recall with precision any interactions they had with Hamrit five years prior, the Court assesses that they tried their best to remember relevant facts and testified credibly. With respect to Hamrit's witnesses, although the Court finds that Stewart testified largely credibly, it has excluded his proffered expert testimony as not relevant or reliable.[4] While the Court finds that Hamrit testified credibly at

---

[3] With the consent of the parties, Valfre, Riutta, Randall, and Stewart testified remotely via videoconference. *See* Dkts. 67 at 17:11-25 (transcript from status conference on July 9, 2024), 96 (letter, dated October 16, 2024, from Citigroup), 97 (letter, dated October 16, 2024, from Hamrit).

[4] On November 26, 2024, the Court granted Citigroup's motion to exclude Stewart's testimony pursuant to Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Dkt. 85, excluding Stewart's testimony as neither relevant nor reliable. *See Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 22 Civ. 10443 (JPC), 2024 WL 4891889 (S.D.N.Y. Nov. 26, 2024). On December 9, 2024, Hamrit filed an interlocutory appeal of that ruling. Dkt. 113. The next day, the Court deemed Hamrit's notice of interlocutory appeal frivolous and legally ineffective to divest the Court of its jurisdiction over this case. Dkt.

several points, the Court does not credit his testimony denying having electronically executed the arbitration agreement, as that part of his testimony was sharply contradicted by other trial evidence, and his demeanor when questioned as to that issue was evasive and occasionally combative.

## A. The C29 Brokerage Account

Higman, who formerly was the head of Digital Wealth Products for Citibank's U.S. Consumer Wealth Division, provided at trial the following details about the "C29 account," a digital self-directed trading account that Citigroup offered to certain clients from around 2015 to 2022. Trial Tr. at 9:25-10:25, 12:11-12. A self-directed trading account is a type of brokerage account in which the client can make investments without assistance from a financial advisor or a wealth representative. *Id.* at 11:11-20. C29 is an internal label used at Citigroup. *Id.* at 10:12-13.

A C29 account was only available to certain existing Citibank clients with a preexisting checking account. *Id.* at 9:25-10:16, 11:1-12:19. A C29 account could only be opened after a client used their preexisting Citigroup credentials to log into their account over Citigroup's mobile application, and then proceeded through the account-opening process. *Id.* at 12:11-19. Thus, Citigroup employees could not open a C29 account on a client's behalf, nor could they set up a C29 account even with a client's express authorization. *Id.* at 25:23-26:23, 28:16-25.

Higman also explained the process by which a client would create a C29 brokerage account, walking through an admitted exhibit that demonstrated the process flow for opening such an account. *See id.* at 14:16-25:18; Defts. Exh. 7 ("C29 Process Flow"). This process entailed a number of steps. A client first would open the mobile application and, using their login credentials, sign into their account. Trial Tr. at 15:4-12. In the marketing page of the mobile application, the

---

114. On April 10, 2025, the Second Circuit dismissed Hamrit's interlocutory appeal for lack of jurisdiction. *See Hamrit v. Citigroup Glob. Mkts., Inc.*, No. 24-3217 (2d Cir.), Dkt. 20.

client would be presented with offers for different Citigroup products, including the C29 account. *Id.* at 15:19-22.  If the client clicked on a button labeled "Open an Investment Account," the application would then display a page with additional information about such an account.  *Id.* at 15:23-12; *see* C29 Process Flow at 3.  To initiate the account-opening process, the client would click on a button labeled "Get Started," leading to a screen providing legal details and noting that the account entails certain terms and conditions.  Trial Tr. at 16:13-20; C29 Process Flow at 3. The client would then be transported to a screen labeled "Review Your Information," with instructions that the client should "confirm that the information we have on file is up to date." Trial Tr. at 16:21-17:6; C29 Process Flow at 3.  These steps are depicted below:



1.Promoted through the Citi app



2.Investing  account value prop



3.Disclosure before starting the application



4.Review personal information

C29 Process Flow at 3.

Because the C29 account was available only to existing clients and could be established only post-login, Citigroup would automatically populate the client's personal details including name, birthday, address, and email—information which the client had provided to Citigroup when they opened their preexisting account.  Trial Tr. at 16:21-17:10; *see* C29 Process Flow at 3.  The client would be able to edit this personal information as needed.  Trial Tr. at 17:11-18:4; *see* C29

Process Flow at 3-4.  The client was then required to click through several screens on which the client would provide additional information necessary to establish the investment account, including employment details, professional affiliations that the bank must report to regulators, annual income, liquidity, and knowledge of financial products.  Trial Tr. at 18:6-19:25; *see* C29 Process Flow at 5-7.  The first few of these screens are depicted below:

   

5.Change Mailing Address        6.Employment details (part 1)        7.Employment details (part 2)        8.Professional affiliations

C29 Process Flow at 5.

After completing some steps not relevant here, the client's screen landed on a "playback" page, which displayed all the information the client submitted during the account-opening process with the ability to edit any of that information.  Trial Tr. at 20:24-21:8.  A depiction of these screens is below:


17. Link Citi Checking Account


18. Review inputted information


19. Terms & Conditions


20. Complete W9

C29 Process Flow at 7.

After confirming that information, the customer came to a "Terms and Conditions" page, the beginning of which is shown above, with all of the documents and agreements needed to open the C29 account. Trial Tr. at 21:9-16; C29 Process Flow at 7. On the screen was a box (the "Check Box") that the client could check electronically, thereby confirming, "By checking this box, I agree to the following:". C29 Process Flow at 7. Below this message was a list of agreements and terms, some of which were hyperlinked. *Id.* Among the agreements listed with an associated hyperlink was an arbitration clause, discussed in greater detail below. Trial Tr. at 34:22-35:8; *see infra* II.C. While the C29 account-opening process did not entail the client clicking a specific box for that arbitration clause, *see* Trial Tr. at 175:1-13, the Check Box expressly covered all agreements included in the list that followed, C29 Process Flow at 7. A client could not continue through the C29 account-opening process without agreeing to the arbitration provision by checking the Check Box. *See* Trial Tr. at 33:7-10.

After agreeing to the terms and conditions, the client would provide further information before reaching a portion of the application that allowed the client to memorialize: "By typing my

name in the box below, I agree I am electronically signing this document and understand that I am making the above certifications under penalties of perjury." C29 Process Flow at 8. The client would type their name into that box, which Citigroup used as an e-signature for the client. Trial Tr. at 23:1-13, 23:25-24:3; *see* C29 Process Flow at 8. The client next would be presented with two security questions, such as the client's mother's maiden name and the first school the client attended. Trial Tr. at 23:14-24:9; C29 Process Flow at 8. Finally, the client would submit the application by clicking a "Submit" button, which prompted a "success" screen to appear. Trial Tr. at 24:21-25:5; C29 Process Flow at 8. This success screen confirmed the submission of the application and provided the client with a reference number, as shown below:



21.Tax withholding status



22.Electronic signature and security question



23. Paperless option, submit application



24.Application submit confirmation

C29 Process Flow at 8.

Higman explained that, at this point, the application was sent to Citigroup's back office for review and approval of the account opening. Trial Tr. at 25:6-10. After approval, relevant documents were sent to Pershing, the company responsible for holding Citigroup's brokerage accounts and clearing trades, and an account number for the client's C29 account was generated. *Id.* at 18:10-12, 25:11-18.

Higman testified about two other records that were created once the application was completed. First, a completed application generated a standard Citi Wealth Management account application and client agreement, which served as a "replay" of the digital application and was used for all U.S.-based Citigroup brokerage accounts. *Id.* at 29:6-22, 33:10-12; *see* Defts. Exh. 1 ("Client Agreement"). This standard client agreement included information automatically populated from the client's original account, as well as other information the client inputted when completing the C29 account-opening process described above. Trial Tr. at 30:10-32:16. Hamrit's account application and client agreement was received in evidence as Defendants' Exhibit 1. *Id.* at 30:4-9. This document contained the arbitration clause that was listed among the terms and conditions during the online account-opening process and expressed the parties' agreement to arbitrate certain disputes. *Id.* at 32:17-33:12; Client Agreement at 9-10; *see* Defts. Exh. 2 (Electronic Signature Record ("ESR")) at 3. As noted above, this arbitration agreement was listed with an associated hyperlink in those terms and conditions, and therefore fell within the category of documents covered by the Check Box; again, a client had to check the Check Box to complete the application process for a C29 account and doing so indicated their review of and agreement to all the relevant terms and conditions. Trial Tr. at 33:1-12, 34:22-35:8.

To document the client's agreement, the account application and client agreement contained an image of the e-signature the customer had created by typing their name into the online application. *Id.* at 33:13-34:21. This process resulted in a slightly blurry image, as reflected in the "Account Owner Signature" field of Hamrit's Client Agreement. *Id.* at 34:12-17; Client Agreement at 7.

Second, Higman testified that the C29 account-opening process generated an ESR.[5]  The

ESR for Hamrit's opening of his C29 account was received in evidence at trial as Defendants'

Exhibit 2.  Trial Tr. at 36:13-21.  This document is generated for all of Citigroup's digitally opened

accounts and records what occurred during the account-opening process, with a focus on the digital

aspects of the process.  *Id.* at 35:19-36:7.  The ESR documents the account ID, the IP address of

the device used to complete the application, the username of the applicant, and a unique identifier

labeled "Session ID" which identifies the particular online session during which the activity

occurred.  *Id.* at 40:3-17; *see* ESR at 1.  Importantly, the ESR also records the method used to sign

the agreements and the text of the agreements at the time of the client's acknowledgement.  Trial

Tr. at 37:7-43:7; *see* ESR at 1-4.  An ESR cannot be generated unless the client had completed all

aspects of the online application, including for purposes of a C29 account application checking the

Check Box confirming review of and agreement to the terms and conditions, which again for such

an application included the hyperlinked arbitration clause.  Trial Tr. at 43:4-44:11.

### B.  Hamrit Opens Accounts with Citigroup

In July 2019, Hamrit resided in Vienna, Virginia.  Trial Tr. at 223:14-16.  On July 9 and

July 12 of that year, Hamrit opened two sets of accounts at Citigroup's McPherson Square branch

at 1100 Vermont Avenue, Northwest, in Washington, D.C.  *Id.* at 45:18-47:8, 138:25-139:1, 194:1-

5; *see* Defts. Exh. 13 (Concierge Daily Transaction/Transmittal Report ("Concierge Report")[6]

---

[5] Hamrit, relying on Stewart's report, contends that his ESR "contains manipulated timestamps and inconsistent IP addresses . . . render[ing] the ESR unreliable."  Hamrit Br. at 6-7, 18; Hamrit Reply at 8.  As noted at *supra* n.4, the Court excluded Stewart's proffered expert testimony.  The Court also finds the ESR to be consistent with the other evidence in the record. *See infra* II.C.

[6] Hamrit argues that Citigroup's production of only a portion of the Concierge Report violated its discovery obligations and warrants an adverse inference against Citigroup.  Hamrit Br. at 6, 14-15, 17.  At a discovery conference held on September 5, 2024, the Court denied Hamrit's

documenting that Hamrit opened accounts on July 9, 2019). One set of accounts was Hamrit's personal savings and checking accounts, while the other set of accounts was for his business, Edazia LLC. Trial Tr. at 194:1-5, 222:12-223:8. Hamrit testified that, to open these accounts, he provided personal information to a Citigroup representative, who inputted that information into the bank's computer system. *Id.* at 223:9-13. Hamrit testified that he "generally" reviewed the completed account documents before signing them. *Id.* at 228:20-229:15.

Hamrit was registered as a Citigold client. *See id.* at 142:24-143:1, 198:16; Defts. Exh. 11 (May 8, 2020 email from Randall to Hamrit). Riutta and Randall were Hamrit's primary points of contact at the McPherson Square branch. Trial Tr. at 195:25-197:1. As a Citigold relationship manager, Riutta worked with high net-worth clients with a bank balance of over $200,000 and helped set up those clients with different Citigroup products like advisory services and mortgages. *Id.* at 129:15-23. Riutta testified that he could not open a C29 account for a client and did not open one for Hamrit. *Id.* at 130:16-131:17 (explaining that Citigroup's relationship managers could not open an online C29 account for a customer because they "were not given any kind of latitude or ability to open up an online account for a client"); *see id.* at 131:21-25, 133:8-11.

As a wealth advisor in Citigroup's McPherson Square branch, Randall managed clients' investable assets, primarily for retirement or general savings and investment. *Id.* at 138:25-139:7. Although a wealth advisor was able to manually open certain kinds of accounts, Randall explained that he was not permitted to open a C29 account for a client and he did not do so for Hamrit. *Id.*

---

request for production of the entire Concierge Report based on representations from Citigroup's counsel that the remainder of the document did not contain material relating to Hamrit or his accounts, but instead concerned the activities of other Citigroup clients. *See* Minute Entry dated Sept. 5, 2024; Citigroup Reply at 6. At the same conference, the Court similarly denied Hamrit's request for production of any applications for his personal checking and savings accounts, based on Citigroup's representation that such documents do not exist. *See* Minute Entry dated Sept. 5, 2024; Citigroup Reply at 6.

at 140:2-12, 141:2-11, 145:20-25.  Randall sent Hamrit a routine welcome email on May 8, 2020, after the opening of Hamrit's C29 account.  Defts. Exh. 11; Trial Tr. at 141:15-143:1.  This email in no way reflected Randall's involvement in opening the account, however.  Although Hamrit testified that Riutta and Randall called him to discuss a brokerage account at the beginning of May 2020, Trial Tr. at 196:15-21, Riutta and Randall did not recall at trial that such a call ever took place, *see id.* at 132:21-133:11 (Riutta disclaiming that he was involved in opening Hamrit's brokerage account and not recalling ever speaking with Hamrit), 180:14-22 (Randall not recalling such a call).  Whether Riutta or Randall in fact had a call with Hamrit in early May 2020 discussing a Citigroup brokerage account is irrelevant, however, to whether Hamrit himself electronically opened a C29 account and, in doing so, consented to an arbitration agreement.

On July 9, 2019, Hamrit registered his personal accounts online, with the user ID "Houssam10." *Id.* at 48:6-11, 49:7-12, 220:3-5, 238:14-239:14; *see* Defts. Exh. 3 (Citibank record of online account registration).  Hamrit used his iPhone to access his online accounts via the Citigroup application.  Trial Tr. at 220:25-221:5.  Hamrit later changed the password for his online accounts.  *Id.* at 241:9-11; *see* Defts. Exh. 14 (July 12, 2019 email from Citigroup to Hamrit including a link to recover his password).  As Higman explained, Citigroup employees do not have access to a client's password and "can only help reestablish passwords by having [the client] reset them" through a standard password recovery process.  Trial Tr. at 51:21-52:5.

## C. Hamrit Opened a C29 Account and Executed an Arbitration Agreement on May 3, 2020

The evidence at trial established that Hamrit opened a C29 account via his Citi mobile application on May 3, 2020, and further that during the account-opening process he electronically signed the application and agreed to its terms and conditions, thereby indicating his agreement to an arbitration clause.  Valfre testified at trial that Citigroup produces in the regular course of its

business a record called a ThreatMetrix report, also known as a "TMX report."  Trial Tr. at 94:8-21; *see* Defts. Exh. 4 ("TMX Report").  Valfre explained that this report captures "[e]ach digital session" that a client has on Citigroup's online platform and that the report "has a bunch of different data points that [Citigroup's fraud officers] review" when assessing fraud risk.  Trial Tr. at 94:5-9, 94:20-21, 94:25-95:3.  Valfre elaborated that a TMX report includes certain "digital evidence," such as the "time that a person may have logged in on their account, [the] account user ID that was used, the time that [the account] was accessed, what was done within that session, and how that session was authenticated."  *Id.* at 96:4-7.  Valfre further explained that the TMX report captures "session information, such as a unique session ID[;] . . . geo location, which would be IP address, true IP address, and DNS IP address[;] . . . latitude and longitude[; and] . . .  transaction information, what was done within that session, if there was any type of transfers, and such.  And then you have an authentication [the user] used, or any challenges, and how they were passed."  *Id.* at 96:8-14.

The TMX report for Hamrit, which was received in evidence as Defendants' Exhibit 4, Trial Tr. at 95:11-16, shows that Hamrit opened an online brokerage account on May 3, 2020.  *Id.* at 98:14-100:4; 100:9-18; TMX Report at Rows 103-104.  As Valfre testified at trial while going through Hamrit's TMX report, the report logged a biometric login for a digital session at 10:58 a.m. Eastern Standard Time ("EST")[7] on May 3, 2020, merely five minutes before the C29 account

---

[7] Valfre explained that the TMX report recorded time in universal time.  Trial Tr. at 97:13-15.  Thus, Hamrit's contention that a four-hour time discrepancy exists between the ESR and the TMX report, *see, e.g.*, Hamrit Reply at 8, 11, is easily explained because the ESR was recorded in EST.  *See* Trial Tr. at 121:18-122:9 (Higman's testimony explaining this in response to Hamrit's query about the time discrepancy).

was opened.[8]  Trial Tr. at 97:21-25 ("I can see that this session on 5/3 began with user ID Houssam10, with that unique ID number under column C.  And this was the initial login, and it was a biometric login.  It was a face ID so, basically, holding a phone up or camera, and facial recognition to log in, to authenticate."), 98:11-13 ("Q.  And he logged in using facial recognition, not using a password; is that correct?  A.  That's correct."), 98:1-7 (testifying that the login was at 10:58 a.m. EST), 121:17-122:10 (explaining that the TMX report shows the account-opening event began at 11:03 a.m. EST); TMX Report at Rows 103-104 (indicating a face ID login to begin an online session five minutes before the brokerage account-opening process began).

Hamrit confirmed at trial that, at some point prior to May 3, 2020, he had registered his online accounts to allow for login by facial identification.  Trial Tr. at 242:7-18.  Valfre described a biometric login like that used on May 3, 2020, as the "highest form of authentication" Citigroup employs for logins.  *Id.* at 108:8-9.  Hamrit presented no evidence, or even offered any theory, for how a biometric login could have occurred absent him using his own device.  Nor did Hamrit offer any evidence to impeach the adequacy of Citigroup's security process for authenticating his identity when the C29 account was opened.  Significantly, Valfre explained that a Citigroup employee would not have been able to access the account via a biometric login.  *Id.* at 100:5-8.  Indeed, the only way that an employee could have opened Hamrit's C29 account during the online session on May 3, 2020, would have been for Hamrit to have logged in using facial identification and then handed his phone to that employee to complete the account-opening process.  *Id.* at 104:23-105:4.  No evidence was offered at trial suggesting that anything like this occurred.

---

[8] While Hamrit contends that he could not have completed the onboarding process in only five minutes, Hamrit Br. at 10-11, 16, 18, Valfre explained that the times included in the TMX report are merely a "snap shot" denoting when a specific event in an online session began, Trial Tr. at 127:3-21.

The TMX report shows that the login for the C29 account-opening session occurred in Maryland.  *Id.* at 101:11-15; TMX Report at Row 103, Column W.  Hamrit testified that, on May 3, 2020, he lived in Rockville, Maryland.  Trial Tr. at 221:15-17.  While the TMX report denotes a city designation of Kensington, Maryland, *see, e.g.*, TMX Report at Rows 103-104, Column R, Valfre testified that this reflects "the city that the DNS address" is associated with, and therefore is not indicative of the location of the device but instead shows the location of the "DNS server" which "could be located in a central location."  Trial Tr. at 109:15-110:3.  The TMX report also shows that the device used for the session was an iPhone, *id.* at 100:19-101:10; TMX Report at Rows 103-104, Column BG, and Hamrit testified that he owned an iPhone and used that device to access his online accounts at this time, Trial Tr. at 220:6-221:5.  The TMX report further shows steady access to Hamrit's Citigroup accounts over several months from the same IP location, *id.* at 102:24-103:20; TMX Report at Rows 84-111, 115-124, 127-129, 134-153, Columns U, X, Y (covering period of March 31, 2020, to June 26, 2020), and from the same device, Trial Tr. at 103:21-104:22; TMX Report at Rows 2-38, 40-58, 61-81, 83-178, Columns BG, BT (covering period of January 6, 2020, to July 8, 2020), that were used when his C29 account was opened on May 3, 2020.  No evidence was presented at trial to suggest that someone other than Hamrit had access to his iPhone or otherwise had access to his Citigroup accounts, unauthorized or otherwise, at this IP location or for this duration.

The information in Hamrit's TMX report is entirely consistent with data recorded in the ESR for Hamrit's online account application.  The same unique Session ID associated with the biometric login on May 3, 2020, is reported in both the TMX report and the ESR.  Trial Tr. at 105:5-107:2; TMX Report at Rows 103-104, Column GM; ESR at 1.  The ESR also reflects the same IP address and account username for the opening of Hamrit's C29 account as shown in the

TMX report for that session.  Trial Tr. at 107:3-17, 107:24-108:11; TMX Report at Rows 103-104, Columns D, U; ESR at 1.  Based on the information contained in the TMX report and the ESR, along with Valfre's fully credited testimony explaining those documents, the Court finds, easily by a preponderance of the evidence, that Hamrit logged into his Citigroup mobile application on May 3, 2020, using a biometric login, and opened a C29 account on that date.

The ESR also establishes that Hamrit executed an arbitration agreement when he applied for that C29 account.  Among the "Text at time of Acknowledgements," the ESR specifically lists: "I have read and understand the [Citi Personal Wealth Management] Client Agreement, accept and agree to its terms, and provide my electronic signature" and "I acknowledge that I have received a copy of the Client Agreement which contains a pre-dispute arbitration clause at Section 6 . . . ." ESR at 3.  As reflected in the ESR, this pre-dispute arbitration clause was among the terms and conditions covered by the Check Box that Hamrit checked during the online application process for the C29 account, reflecting his review and agreement to this clause.  Trial Tr. at 35:25-36:7, 40:18-42:13.  That arbitration provision read, in relevant part:

**6. Arbitration**

**This agreement contains a pre-dispute arbitration clause.  By signing an arbitration agreement the parties agree as follows:**

- **All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**

**\* \* \***

**I agree that all claims or controversies, whether such claims or controversies arose prior, on or subsequent to the date hereof, between me and CGMI[9] . . . concerning or arising from (i) any account maintained by me with CGMI . . . individually or jointly with others in any capacity; (ii) any transaction**

---

[9] The Client Agreement defines "CGMI" as "Citigroup Global Markets Inc. or its direct or indirect subsidiaries and affiliates or their successors or assigns."  Client Agreement at 8.

> **involving CGMI . . . and me, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this or any other agreement between us . . . , any duty arising from the business of CGMI . . . or otherwise, shall be determined by arbitration before, and only before the Financial Industry Regulatory Authority ("FINRA").**

* * *

Client Agreement at 9-10 § 6 (emphasis in original).  This arbitration language was accessible via a hyperlink on the terms and conditions screen of the account-opening process for his C29 account. Trial Tr. at 41:14-25; *see* C29 Process Flow at 7.  To reiterate, Higman testified that Hamrit could not have proceeded through the account-opening process and opened a C29 account without confirming his agreement to the account's terms and conditions, including the above arbitration clause.  Trial Tr. at 21:17-22:17.  Then, in order to ultimately submit the application, Hamrit needed to type his name as an electronic signature for the application.  C29 Process Flow at 8 ("By typing my name in the box below, I agree I am electronically signing this document . . . .").

Hamrit's affirmation of the arbitration agreement is further recorded through Hamrit's signature on the Client Agreement, which is a copied image of the name Hamrit typed into the mobile application to submit his C29 account application.  Trial Tr. at 33:13-34:21.  While Hamrit contends that this copy of his signature occurred without his consent, Hamrit Reply at 7, this was Citigroup's normal process for documenting "exactly what [Hamrit] typed into the digital account process," rendered as an image "to show the signature" on the document.  Trial Tr. at 33:25-34:3. The Client Agreement shows that Hamrit electronically signed the application and certified his agreement to the terms and conditions listed under the Check Box.  *See* Client Agreement at 7; Trial Tr. at 42:16-43:7.

These findings are bolstered by Hamrit's failure to object to the existence of his C29 account from the time the account was opened until nearly three years later.  Trial Tr. at 242:20-

17

244:20.  This was despite Hamrit attempting to use the C29 account to place trades.  *See id.* at 244:24-246:25; *see also id.* at 245:7 (Hamrit testifying, "I was trading on the app.").  In addition, the Court finds no support for Hamrit's unsubstantiated speculation that the C29 account was somehow gifted to him, *id.* at 242:20-243:16, particularly in the face of Higman's credible and uncontradicted testimony that Citigroup employees were unable to open a C29 brokerage account on behalf of a client and "the only way to establish that account [was] through the mobile account opening," *id.* at 25:23-26:23, 28:22-23.  Rather, the evidence at trial overwhelmingly established that Hamrit's C29 account only could have been opened by Hamrit himself after completing the online application and in the process agreeing to the arbitration provision, and that this is what occurred on May 3, 2020.

### D.  Hamrit's Purported Irregularities Hold No Significance

Hamrit contends that several purported irregularities in Citigroup's documentation reflect that he did not agree to arbitrate his claim in this case.  *See, e.g.*, Hamrit Br. at 17.[10]  None of these purported irregularities call into doubt whether Hamrit signed the arbitration agreement.

Hamrit points to various pieces of supposedly incorrect information in the C29 application, including his immigration status, his permanent address, his mother's maiden name, his income, and the IP address reflected in Citigroup's records for the session on May 3, 2020.  *See, e.g.*, Hamrit Reply at 4, 8-10.  The Court finds that most of this information was provided by Hamrit when his original accounts with Citigroup were opened and that any incorrect information was automatically populated during the account-application process and not edited by Hamrit.  Higman

---

[10] The Court is obliged to construe *pro se* filings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted); *accord Rahmankulov v. United States*, Nos. 23 Civ. 3206 (RA), 20 Cr. 653 (RA), 2023 WL 3303949, at *1 (S.D.N.Y. May 8, 2023), and does so here.

testified that Citigroup would not have checked this preestablished information at the time a C29 account is opened, operating on the assumption that "the documents that were filled out during that account opening were filled out correctly." Trial Tr. at 82:25-83:6. Citigroup then automatically populated the information which Hamrit had provided when he originally opened his accounts into the C29 application. *Id.* at 30:10-31:13. Hamrit's challenge to Higman's testimony on the ground that Higman was not employed at Citigroup during the period in question, Hamrit Br. at 9, 18, is not persuasive. Higman explained at trial that he was "very familiar with the account opening [process]" at the time that Hamrit's accounts were first opened because Higman's former work responsibilities "required [Higman] to understand that account through its life cycle." Trial Tr. at 59:5-21. Contrary to Hamrit's suggestion, Hamrit Br. at 9, Higman did not testify that there were discrepancies in Citigroup's records, *see* Trial Tr. at 75:13-75:25. Hamrit's repeated contention that Higman testified that Citigroup employees could reset a client's security credentials without their involvement, *see, e.g.*, Hamrit Reply at 16, likewise finds no support in the record. To the contrary, Higman testified that Citigroup employees do not have access to a client's password and "can only help reestablish passwords by having [the client] reset them" through a standard password-recovery process like the form password reset email that Hamrit received when he changed his password. Trial Tr. at 51:21-52:5; *see* Deft. Exh. 14 (July 12, 2019 password recovery email to Hamrit).

Hamrit points out that the C29 application incorrectly reflects that he is a resident alien. *See, e.g.*, Hamrit Reply at 6; Trial Tr. at 263:15-16 (Hamrit testifying that "[t]here [are] discrepancies between my immigration status" in the C29 account documentation). According to Hamrit, at the time he registered his accounts, and continuing to the present day, Hamrit was a non-resident alien present in the United States on a B-1 visa. Trial Tr. at 221:21-222:11. Yet,

Hamrit represented (apparently falsely) on his application for an account with Citigroup for his company, Edazia LLC, that he was a resident alien.  *See* Defts. Exh. 10 at 2 (Business Deposit Account Application for Edazia LLC); *see* Trial Tr. at 248:19-250:13.  Hamrit testified at trial that he reviewed and signed the Edazia LLC account application with this incorrect information.  Trial Tr. at 250:11-13.  In addition, on July 12, 2019, Hamrit signed two Form W-9s, one for his personal accounts and one for his business accounts, on which he falsely certified under penalty of perjury that he was a U.S. citizen or other U.S. person.  *See* Defts. Exhs. 8, 9; Trial Tr. at 229:24-234:24, 235:6-23, 251:18-252:9.  Hamrit confirmed at trial that these statements were not correct, as he is neither a U.S. citizen nor other U.S. person.  Trial Tr. at 253:5-254:16.  While Hamrit offered another document related to his business account application which did indicate he was a non-resident alien, Pl. Exh. 19 at 23; *see* Trial Tr. at 263:22-264:10, the trial evidence established that Hamrit was inconsistent in truthfully representing his immigration status to Citigroup.[11]

Hamrit also contends that the C29 application incorrectly lists his permanent legal address as Vienna, Virginia, whereas he was living in Rockville, Maryland at the time of that application.  Hamrit Br. at 20.  Higman testified that Citigroup records a client's legal address and mailing address separately.  Trial Tr. at 17:12-18:2. Hamrit acknowledged that he was living in Vienna when his original accounts were established, *id.* at 223:14-15, and testified that he did not recall updating his legal address with Citigroup when he moved to Rockville, *see id.* at 221:15-20.  This Vienna, Virginia address would have been ported over along with the other preexisting account

---

[11] Indeed, notwithstanding Hamrit's testimony at trial that he was a non-resident alien at the time of his account creation and continuing to the present, *see* Trial Tr. at 221:21-222:11, Hamrit contends in his post-trial brief that "[a]t the time of the alleged account creation, I was a lawful resident of the United States with accurate personal information on file with the Citigroup Defendants," Hamrit Br. at 8.

information into the C29 application, explaining the supposed discrepancy.[12]

Hamrit also argues that there is a discrepancy in the spelling of his mother's maiden name. Hamrit's C29 application states that his mother's maiden name is "Fatiga," Client Agreement at 1; in fact, his mother's maiden name is "Fatiha," Trial Tr. at 254:17-255:1. This purported discrepancy is unconvincing for a few reasons. First, Hamrit previously had inputted his own surname as his mother's maiden name on Citigroup documentation. On his Edazia LLC account application, Hamrit represented that his mother's maiden name is "Hamrit." *See* Defts. Exh. 10 at 2. Hamrit confirmed at trial that he reviewed this information prior to signing the Edazia LLC account application, but nonetheless incorrectly wrote his mother's maiden name. Trial Tr. at 255:6-256:18. This reflects that Hamrit did not accurately input or carefully review the documentation he submitted to Citigroup regarding his mother's maiden name. Second, the difference between the supposed correct spelling of Hamrit's mother's maiden name ("Fatiha") and the spelling on the C29 account application ("Fatiga") is just one letter. Moreover, the different letters—g and h—are located next to each other on a keyboard, meaning that Hamrit could have accidentally hit the wrong letter on his iPhone when typing the name. This scenario becomes even more plausible because the text in question was hidden from the user's view, meaning Hamrit may not have even noticed the typo. *See* Trial Tr. at 24:10-16; C29 Process Flow at 8.

Turning to Hamrit's income, the C29 account application states that his income was $150,000, while Hamrit maintains that he had no income at that time. Client Agreement at 2; Trial

---

[12] Hamrit's assertion that this and other purported irregularities suggest Citigroup did not meet its Know Your Customer and Bank Secrecy Act obligations, Hamrit Br. at 8, 17, is irrelevant to the sole question at trial of whether the parties entered into a valid arbitration agreement that covers this action.

Tr. at 256:20-257:5.  As discussed, Higman explained that, during the C29 account-opening process, Citigroup would automatically fill in various information previously provided by the client.  Trial Tr. at 17:2-6.  The Court draws the inference that Hamrit previously supplied that income level to Citigroup, perhaps when he originally opened his accounts, as evidenced by a recording of a customer service call, which was received in evidence at trial.  *See* Defts. Exh. 12.  During that call, a Citigroup representative asked Hamrit to confirm Citigroup's record that his annual income was $150,000 and Hamrit confirmed the accuracy of that information.  Trial Tr. at 259:11-260:24; Defts. Exh. 12.  The Citigroup representative would have had no basis to ask that question absent Hamrit having previously provided that income level to Citigroup.  Hamrit's lack of surprise on the call when asked about the figure further indicates that he had provided it as his annual income.

Hamrit also contends that the IP addresses displayed in the TMX report and the ESR do not reflect his device, because the service provider of that IP address is Verizon, rather than his cellular carrier, T-Mobile.  Hamrit Reply at 10, 13.  But the TMX report documents that the iPhone used during the session was accessing WiFi, Trial Tr. at 102:5-19; TMX Report at Rows 103-104, Column FI, and that the service provider for that WiFi was Verizon, Trial Tr. at 102:20-23; TMX Report at Rows 103-104, Columns S, T.  This adequately explains any supposed discrepancy in the IP address and associated service provider.  *See* Trial Tr. at 38:5-39:3.  Hamrit also contends that the IP address locations reported on the TMX report and the ESR differ.  *See, e.g.*, Hamrit Reply at 8.  But the ESR does not include a location, only an IP address which is identical to that listed in the TMX report.  *See* ESR at 1; TMX Report at Rows 103-104, Column U.  Moreover, the difference between the IP address location in the TMX report and Hamrit's city of residence is explained by Valfe's testimony that the TMX report logs the location of the DNS server.  *See*

Trial Tr. at 109:15-110:3.

Hamrit also repeatedly emphasized at trial and in his post-trial submissions that the exhibit that Citigroup introduced to demonstrate the steps involved in opening a C29 account, *see* C29 Process Flow, should be disregarded because he was a Citigold client and had a gold banner on his mobile application, while the admitted document shows an application with a blue banner.  Hamrit Br. at 9; Hamrit Reply at 7; *see, e.g.*, Trial Tr. at 72:14-73:18.  Higman explained that a Citigold client's mobile application would display a gold color in certain circumstances, rather than a blue color for other kinds of Citigroup clients.  Trial Tr. at 72:14-73:17.  The difference in the color of those banners, however, holds no relevance to the process by which Hamrit opened his C29 account and his agreement to the relevant terms and conditions.  Higman credibly testified that the steps to open such a brokerage account were the same for all Citigroup clients and the blue/gold difference was purely aesthetic to reflect the customer level.  *Id.* at 73:20-24 (explaining that the only difference was the color of the banner displayed).

At trial, Hamrit also attempted to undermine the integrity of the TMX report by testifying that he made a payment on May 3, 2020, which is not included in the report.  *Id.* at 204:12-205:2; *see* Hamrit Reply at 15.  Although Hamrit offered into evidence a bill that recorded a payment to "CITI CARDS" on May 3, 2020, *see* Pl. Exh. 20 at 1-2, no evidence was introduced at trial that this payment was made via Hamrit's *mobile account* on that date, and Hamrit presented no evidence that a non-mobile payment would have been recorded on the TMX report.  Indeed, when Valfre testified about the TMX report, Hamrit did not explore this supposed discrepancy on cross-examination.  Moreover, the TMX report does log a payment transfer transaction on May 8, 2020, the day that Hamrit's exhibit shows the billing period ended, and that transaction would be consistent with the payment Hamrit cites.  In any event, any argument by Hamrit about a supposed

23

failure or delay in reporting this payment in no way undermines the extensive testimony and evidence at trial that conclusively established that Hamrit opened the C29 account and entered into the arbitration agreement on May 3, 2020.

Similarly, Hamrit points to purported metadata extracted from the TMX report to undermine the report's credibility. Hamrit Br. at 7. The extracted metadata was not admitted into evidence and the Court sustained Citigroup's objection when Hamrit attempted to offer it at trial. Trial Tr. at 162:22-164:22. Hamrit did not attempt to question Valfre about any metadata modification on cross-examination and no evidence was introduced at trial that undermined the TMX report's credibility.

Hamrit further points to Randall's testimony to argue that Citigroup "failed to follow its own established procedures." Hamrit Br. at 10, 17-18. Randall clearly testified that he could not say whether Citigroup's supervisory procedures and protocols were or were not followed, simply because such issues were outside his job responsibilities. *See* Trial Tr. at 187:10-188:24. Likewise, Hamrit misstates Valfre's testimony concerning whether biometric verification was utilized during the account-opening process. *See* Hamrit Br. at 17. Valfre testified that biometric access was utilized to begin the account-opening session, Trial Tr. at 97:21-25, and the TMX report reflects that to have been the case, TMX Report at Row 103, Column F.

In sum, none of Hamrit's purported discrepancies undermine the Court's finding that Hamrit applied online to open a C29 account on May 3, 2020, and agreed to an arbitration provision during that account-opening process.

\* \* \*

The Court therefore finds that Hamrit electronically executed an arbitration agreement with Citigroup, whose terms are quoted above, when he completed and submitted his online C29

account application on May 3, 2020.

### III.  Conclusions of Law

The Court's Opinion and Order of March 26, 2024, set forth much of the law necessary to resolve the pending motion to compel.  *See Hamrit*, 2024 WL 1312254, at *4-5.  Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes."  *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotation marks omitted and alteration adopted); *accord State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996).  But this "policy in favor of arbitration is limited by the principle that arbitration is a matter of consent, not coercion.  Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit."  *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (internal quotation marks omitted and alteration adopted); *see Doctor's Assocs.*, 934 F.3d at 250 (explaining that the FAA was "intended to place arbitration agreements upon the same footing as other contracts," and that arbitration remains "a creature of contract" (internal quotation marks omitted and alteration adopted)).

Pursuant to the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

9 U.S.C. § 4.  Yet, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."  *Id.*  Further, unless a "jury trial [is] demanded by the party alleged to be in default, . . . the court shall hear and determine such issue."  *Id.*[13]

Hamrit's opposition to Citigroup's motion to compel arbitration, Dkt. 35 ("Opposition"), advances two primary arguments.  First, Hamrit contends that he did not sign the arbitration agreement in question.  *Id.* at 8-10, 15-17.  As explained in the Court's prior decision, the question of whether there existed an agreement to arbitrate presented a threshold question of fact which needed to be resolved through a bench trial.  *See Hamrit*, 2024 WL 1312254, at *5-9.  The Court set forth above its findings, by a preponderance of the evidence, following a bench trial that Hamrit electronically agreed to the terms and conditions of the C29 account, including the arbitration clause, when he opened his C29 account, as indicated by him checking the Check Box and electronically signing the application.  The Court thus finds that, on May 3, 2020, the parties agreed to the arbitration provision included in the Client Agreement, the language of which is quoted above.  Hamrit's first argument therefore fails.

Hamrit's second argument is that the arbitration provision in the Client Agreement is not enforceable against him.  In broad terms, Hamrit suggests that he cannot be bound to the agreement because it was hidden in the fine print of the documents.  *See* Opposition at 10-11.  Hamrit similarly argues that the arbitration clause is too vague to constitute a binding agreement.  *See id.* at 11-12, 17-18.

---

[13] Hamrit did not demand a jury trial on the issue of the making of the arbitration agreement.  *See Hamrit*, 2024 WL 1312254, at *9.

Liberally construed, Hamrit's argument that the text of the agreement itself does not establish that he "agreed" to anything other than acknowledging receipt of the documents in question, *see id.* at 18-19, appears to challenge whether a binding contract exists. A "basic tenet of contract law," including in New York,[14] is that for a contract to be binding, there must be "a 'meeting of the minds' and a 'manifestation of mutual asset.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)). The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. *Id.* at 289 (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)); *accord Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053. Understanding Hamrit's argument at its strongest, he contends that mutual assent never existed because clicking the Check Box did not indicate that he "agreed" to the arbitration provision.[15]

---

[14] New York law governs this dispute. *See Hamrit*, 2024 WL 1312254, at *4 n.5. For this reason, Hamrit's appeal to cases applying California law is not persuasive. *See* Hamrit Br. at 11-14; *accord WeWork Cos. Inc. v. Zoumer*, No. 16 Civ. 457 (PKC), 2016 WL 1337280, at *4 n.2 (S.D.N.Y. Apr. 5, 2016) (observing that a litigant's "reliance on California law in her brief is misplaced" because "New York law governs the interpretation of the Agreement"). In any event, Hamrit's cited cases are inapposite. *Gamboa v. Northeast Community Clinic*, 72 Cal.App.5th 158 (Cal. Ct. App. 2021), and *Ruiz v. Moss Bros. Auto Group, Inc.*, 232 Cal.App.4th 836 (Cal. Ct. App. 2014), concerned situations in which a court determined the evidence was insufficient to find that an arbitration agreement was signed. These cases are not persuasive here, as the Court has found that Hamrit signed the arbitration agreement. *Fabian v. Renovate America, Inc.*, 42 Cal.App.5th 1062 (Cal. Ct. App. 2019), similarly does not control because the court there found the evidence insufficient to establish that the electronic signature at issue was authentic. *Id.* at 1067-1070. Here, ample evidence was presented at trial authenticating Hamrit's ratification of the arbitration agreement. *Iyere v. Wise Auto Group*, 87 Cal.App.5th 747 (Cal. Ct. App. 2023), supports Citigroup's position in the litigation, as it held an arbitration agreement enforceable and rejected the position that a failure to read an arbitration agreement before signing it bars enforcement. *Id.* at 756-62; *see id.* at 759 ("It is hornbook law that failing to read an agreement before signing it does not prevent formation of a contract.").

[15] Hamrit also contends that Citigroup's procedures violated the Truth in Lending Act and regulations of the Consumer Financial Protection Bureau. Hamrit Br. at 15. Hamrit provides no

This argument fails based on the Court's factual findings from the evidence at trial.  By checking the Check Box and then digitally signing the account application, Hamrit noted his agreement to the terms and conditions contained in the Client Agreement.  C29 Process Flow at 7 ("By checking this box, I agree to the following:").  The ESR further captured Hamrit's acknowledgement that he had "read and undest[ood] the CPWM Client agreement, *accept[ed] and agree[d] to its terms*, and provide[d his] electronic signature."  ESR at 3 (emphasis added).  Thus, Hamrit's checking of the Check Box and electronic signing of the application evinces mutual asset to the terms of the Client Agreement, including the arbitration clause listed below the Check Box.  A meeting of the minds regarding the arbitration agreement therefore occurred, and, despite Hamrit's suggestion otherwise, there was a "signed agreement to arbitrate," Opposition at 19.  The facts here therefore are easily distinguishable from those in *Seltzer v. Clark Associates, LLC*, No. 20 Civ. 45685 (AKH), 2020 WL 5525590 (S.D.N.Y. Sept. 3, 2020), on which Hamrit relies.  *See* Opposition at 18-19.  That is, nothing in the agreement Hamrit signed "expressly disavows that it creates contractual rights or duties," which was the basis for *Seltzer*'s holding that there was no enforceable contract in that case.  *Seltzer*, 2020 WL 5525590, at *3-4.

Also unavailing is Hamrit's contention that the lack of a specific check box for the arbitration agreement violates the FAA and the Electronic Signatures in Global and National Commerce Act ("E-SIGN Act").  Hamrit Br. at 8, 14-15, 16.  Both statutes merely require that someone evinces their intent to be bound by an arbitration agreement.  Hamrit's ratification of the all-encompassing Check Box and electronic signing of the application easily passes that threshold. *See, e.g.*, *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960) (explaining that under the FAA,

---

explanation to support this blanket assertion and, as will be explained next, the Court concludes that the agreement's terms were sufficiently transparent to support enforcement of the arbitration clause.

"[o]rdinary contract principles determine who is bound by such written provisions and of course parties can become contractually bound absent their signatures" (footnote omitted)); *Mizel Roth IRA ex rel. Consol. Asset Funding 3 LP v. Unified Cap. Partners 3 LLC*, No. 19 Civ. 10712 (NRB), 2022 WL 3359759, at *5 (S.D.N.Y. Aug. 15, 2022) ("When faced with the question of whether a particular moniker constitutes a valid signature under the E-SIGN Act and in other contexts, courts emphasize substance over form, focusing on the intent of the would-be signer.").

Continuing to construe Hamrit's *pro se* filings liberally, the Court next turns to his argument that, because the arbitration provision was included among a long list of terms and conditions, and because its terms were not viewable on the screen of the mobile application but rather in a hyperlinked document, the arbitration provision is unenforceable. *See* Opposition at 18 (arguing that the agreement was a "remote attachment" and thus not binding). This argument, too, fails. Taking Hamrit's argument at its strongest, he appears to challenge the "clickwrap" nature of the agreement. Clickwrap agreements "are formed when a user is presented with a message on his or her computer screen and is required to manifest [his] assent to the terms." *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (internal quotation marks omitted). "The Second Circuit routinely enforces clickwrap agreements as valid and binding contracts, 'for the principal reason that the user has affirmatively assented to the terms of agreement by clicking "I agree."'" *Id.* (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

Hamrit's insistence that he lacked knowledge of the arbitration provision at the time he signed the account-opening agreement is unavailing. Opposition at 18. "Even if there is 'no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.'"

*Valelly*, 464 F. Supp. 3d at 640 (quoting *Meyer*, 868 F.3d at 76).  This hinges on the "'clarity and conspicuousness' of the terms and conditions; in the context of web-based contracts this is often a function of the 'design and content of the relevant interface.'"  *Id.* (alteration adopted) (quoting *Meyer*, 868 F.3d at 75).

Here, Hamrit entered a valid, binding clickwrap agreement.  The terms were reasonably conspicuous in light of the design of the account application and the content of the interface (indeed, the terms of the arbitration clause were bolded in the agreement itself), and the terms and conditions page contained explicit hyperlinks to the relevant agreements including the arbitration clause, which were denoted in brightly colored text.  *See* Trial Tr. at 34:22-35:8 (Higman explaining that the arbitration language was only "one click away"); C29 Process Flow at 7.  While Hamrit's argument stems from the remote nature of the arbitration provision, a clickwrap agreement's terms and conditions "need not all be simultaneously and immediately visible; the terms may be binding and enforceable even if they are only accessible through a hyperlink." *Valelly*, 464 F. Supp. 3d at 640 (collecting cases).  "[C]licking the hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket.  In both cases, the consumer is prompted to examine terms of sale that are located somewhere else.  Whether or not the consumer bothers to look is irrelevant."  *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012). "Regardless of whether he actually read the contract's terms, [Hamrit] was directed exactly where to click in order to review those terms, and his decision to click the [Check Box] button represents his assent to them."  *Starke v. Gilt Groupe, Inc.*, No. 13 Civ. 5497 (LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014).

The arbitration agreement also reaches this dispute.  *See Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 240-41 (S.D.N.Y. 2020) (explaining that "a court faced with a motion

under FAA § 3 and FAA § 4 must determine . . . whether the parties' dispute is covered by the contract" (internal quotation marks omitted)).  In the Complaint, Hamrit alleges that, when trying to familiarize himself with operation of the brokerage account, an unknown "malfunction" occurred which resulted in a buy order of 7,650 shares of stock, with a total purchase price of $432,225.  Dkt. 1 ("Complaint") at 11; *see Hamrit*, 2024 WL 1312254, at *2.  Insisting that he did not intend to purchase the securities but rather was only testing the application, Hamrit seeks in this litigation the return of his funds in the amount of $432,225, as well as $10 million in punitive damages and interest, along with his costs and expenses in the litigation.  Complaint at 6, 11; *see Hamrit*, 2024 WL 1312254, at *2-3.

In opposing Citigroup's motion to compel, Hamrit makes no effort to contend that the instant action about an application "malfunction" falls outside the arbitration agreement's scope. Nor would any such argument have merit.  The arbitration clause covers, among other things, "claims or controversies . . . concerning or arising from (i) any account maintained by [Hamrit] with CGMI . . . individually or jointly with others in any capacity; [and] (ii) any transaction involving CGMI . . . and [Hamrit], whether or not such transaction occurred in such account or accounts."  Client Agreement at 9-10 § 6 (emphasis removed).  By challenging the validity of trading transactions that occurred over his C29 account with Citigroup, Hamrit plainly brings a "claim[] . . . concerning or arising from" his account with CGMI (*i.e.*, Citigroup Global Markets Inc. or its subsidiaries and affiliates, *see supra* n.9), as well as from transactions involving CGMI. As alleged, Hamrit's claim in this action therefore falls squarely within the arbitration provision.

In sum, the Court finds that the evidence at trial established that, on May 3, 2020, Hamrit and Group entered into an arbitration agreement, that the agreement is enforceable and binding on

Hamrit, and that it reaches the claim he brings in this action. Accordingly, this dispute should proceed in arbitration before FINRA, as required by the parties' agreement.

## IV. Conclusion

For these reasons, Citigroup's motion to compel arbitration is granted. To allow that arbitration to proceed, this action is stayed pending completion of the arbitration or until further order of the Court. The parties are ordered to commence arbitration before FINRA within sixty days of the filing of this Opinion and Order. The parties shall file a joint status letter with the Court within two weeks following the completion of the arbitration. The Clerk of Court is respectfully directed to close Docket Number 20 and to stay this case.

SO ORDERED.

Dated: April 22, 2025
New York, New York

_____
JOHN P. CRONAN
United States District Judge